# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-00890-SCT


*MICHAEL COLTHARP*


*v.*


*DR. P. G. CARNESALE AND CAMPBELL CLINIC*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/20/97 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL D. GREER |
| | ANNA CATHERINE PIPKIN |
| ATTORNEY FOR APPELLEES: | ROBERT L. MOORE |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED-2/25/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |


**EN BANC.**


**SMITH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

### FACTS

¶1. On February 16, 1993, the appellant, Michael Coltharp, injured his right arm when he lifted a 55 gallon drum to empty it. To lift the drum, Coltharp placed his left hand on top of the barrel and tipped it over with his right hand under the bottom of the drum. He immediately felt pain and thought he had pulled a muscle. By the time he got off work that evening, his arm was red in the area of the biceps muscle.

¶2. On the following day, Coltharp went to the Baptist Hospital emergency room in Union County, Mississippi. Coltharp was then admitted overnight, and X-rays were taken because the emergency room doctor suspected a dislocated shoulder. However, the next morning, Dr. Bullwinkel informed Coltharp that

he did not have a dislocated shoulder and referred Coltharp to Dr. Carsten, an orthopedic doctor in Oxford, Mississippi. Dr. Carsten was unsure of the source of the problem, so he referred Coltharp to Dr. Carnesale, an orthopedic surgeon, at the Campbell Clinic in Memphis, Tennessee.

¶3. Dr. Carnesale testified that Coltharp was referred to him by Dr. Carsten for evaluation of a mass in the bicep area of his arm. Dr. Carnesale saw Coltharp for the first time on February 23, 1993. Coltharp brought X-rays of the right arm and elbow to Dr. Carnesale on this first visit. The X-Ray Report from Baptist Memorial Hospital in Union County indicated no fractures to the right elbow, right shoulder, or the right humerus. Following his examination, Dr. Carnesale ordered a MRI, needle biopsy and bone scan.

¶4. Following completion of these tests, Coltharp returned to Dr. Carnesale on March 9, 1993. The MRI report indicated extensive musculoskeletal injuries to the right shoulder girdle and long-head of the biceps tendon with a soft tissue mass in the anterior aspect of the arm compatible with a combination of hematoma and torn muscle fibers from the long-head of the biceps muscle. The MRI report further indicated a large impaction fracture of the humeral head on to the glenoid process. However, Dr. Carnesale's notes only referenced the injury to the biceps muscle.

¶5. On March 9, 1993, Dr. Carnesale recommended a range of motion exercises for the right arm and shoulder which consisted of (1) a pulley system attached to a door frame, (2) using fingers to "walk" the arm up a wall, and (3) making of a fist with the right hand. These exercises were recommended in order to preserve some mobility of the shoulder joint.

¶6. Coltharp returned early to Dr. Carnesale on March 16, 1993, concerned about excessive swelling. Dr. Carnesale's notes indicated that he believed the swelling was a result of Coltharp sleeping with his hand in a dependent position. Dr. Carnesale again spoke to Coltharp about appropriate gentle exercises to maintain motion in the shoulder. Additionally, Dr. Carnesale ordered x-rays of the right humerus to show the shoulder.

¶7. Dr. Carnesale next saw Coltharp on April 7, 1993.[1] Coltharp had less swelling and less pain but had some difficulty with the use of his right shoulder. Dr. Carnesale's notes stated that from the x-rays it looked as if Coltharp is developing Charcot arthropathy or neuropathic arthropathy of the right shoulder.[2] However, clinical notes also indicated that films were made of Coltharp's arm and not of the shoulder itself, and that the projection may be a little bit misleading. Dr. Carnesale advised Coltharp to maintain motion of the shoulder, and to do isometric exercises but to let pain limit his activities. Dr. Carnesale ordered x-rays of the right shoulder and asked Coltharp to return in six weeks.

¶8. Coltharp returned to Dr. Carnesale on May 5, 1993, and complained of increasing pain and swelling in the shoulder. Dr. Carnesale's notes stated that x-rays show unequivocal evidence of a neuropathic shoulder. Dr. Carnesale advised Coltharp to avoid trying any type of vigorous activity. Dr. Carnesale stated that the shoulder needs to rest to let the acute phase of this problem settle down, and that he felt a bit remiss in not recognizing the underlying nature of the problem before. Dr. Carnesale then recommended that Coltharp consult the Department of Vocational Rehabilitation for retraining in a job that is not physically strenuous.

¶9. Coltharp filed a complaint on February 23, 1994, claiming that Dr. Carnesale failed to make a timely diagnosis of the neuropathic shoulder (Charcot joint) and negligently treated him by prescribing passive range of motion exercises for the shoulder. Coltharp alleged that as a result of Dr. Carnesale's failure to diagnose and properly treat his condition, he is totally disabled and has no use of his right shoulder.

¶10. Dr. Carnesale denied the allegations of the complaint and denied that any action or failure to act on his part caused any damage or injury to Coltharp. Specifically, Dr. Carnesale maintains that even though he did not make the diagnosis of a neuropathic shoulder until April of 1993, there was nothing Dr. Carnesale could have done to prevent Coltharp's injury to the shoulder joint since Coltharp's injuries were a result of an inherent progress of the disease process, associated with the syringomyelia, already present in Coltharp's body. Furthermore, Dr. Carnesale asserts that his instructions concerning passive range of motion exercises were an appropriate treatment in order to prevent the shoulder joint from completely locking up. Dr. Carnesale further declares that the exercises helped Coltharp maintain some function of the right shoulder.

¶11. In September, 1995, Dr. Carnesale, through his attorneys identified orthopedic surgeon, Dr. Walter R. Shelton, as a defense expert and provided information concerning the expected opinions and testimony of Dr. Shelton.

¶12. The case was set for trial on two occasions. The parties were ready for trial on both occasions, however, due to the trial court's schedule, the trial dates were continued. The trial was eventually set for May 12, 1997. Because Dr. Shelton was scheduled to be out of the country when this case was set for trial, Dr. Carnesale's attorney contacted Coltharp's attorney and requested that the trial date be rescheduled. After Coltharp's attorney refused the request, Carnesale's counsel filed on April 15, 1997, a Motion to Reschedule Trial Date. Dr. Carnesale's motion to reschedule trial date was heard by the court on May 1, 1997, and was denied. Coltharp opposed the motion at the hearing. In denying the motion, the court advised that Dr. Carnesale was allowed to obtain a substitute expert witness and to supplement the interrogatory responses accordingly.

¶13. Subsequently, Dr. Carnesale's Second Supplemental Responses to Interrogatories were served on May 2, 1997, identifying orthopedic surgeon, Dr. Tom Morris of Memphis, Tennessee, as defendant's substitute expert. The supplemental responses indicated that Dr. Morris' opinions were consistent with Dr. Shelton's opinions which had previously been disclosed through discovery.

¶14. The trial was held on May 12-14, 1997, Honorable Kenneth Coleman presiding, in the Circuit Court of Union County, Mississippi. The jury returned a verdict in Dr. Carnesale's favor, and judgment was entered accordingly on May 20, 1997.

¶15. Aggrieved by the trial court's judgment, Coltharp appeals raising the following issues:[(3)]

> **I. THE TRIAL COURT'S DECISION ALLOWING DEFENDANT'S EXPERTS TO RENDER OPINIONS REGARDING SUBSTANTIVE MATTERS NOT REVEALED THROUGH DISCOVERY CONSTITUTED "TRIAL BY AMBUSH," IN DIRECT CONTRAVENTION OF MISSISSIPPI LAW.**

> **II. THE COURT COMMITTED ERROR IN REFUSING TO GIVE PLAINTIFF'S JURY INSTRUCTIONS P-12 AND P-16.**

## LEGAL ANALYSIS

> **I. THE TRIAL COURT'S DECISION ALLOWING DEFENDANT'S EXPERTS TO RENDER OPINIONS REGARDING SUBSTANTIVE MATTERS NOT REVEALED THROUGH DISCOVERY CONSTITUTED "TRIAL BY AMBUSH," IN DIRECT**

**CONTRAVENTION OF MISSISSIPPI LAW.**

¶16. Through the discovery process, Dr. Carnesale identified Dr. Shelton as an expert witness. However, due to a scheduling conflict[(4)] with Dr. Shelton, Dr. Carnesale identified a substitute expert witness, Dr. Morris.

¶17. Coltharp alleges that Dr. Carnesale's substitute expert witness' testimony should not have been admitted into evidence because Dr. Carnesale never supplemented his interrogatory responses to reflect the substance of Dr. Morris' testimony at trial. Specifically, Coltharp argues that "[he] had no notice whatsoever that Dr. Morris would state that [Coltharp]'s loss of use of the shoulder resulted from avascular necrosis -- a 'neurovascular situation' brought about by an 'altered nerve supply to the vessels,' . . . prior to the expert's offering his opinion to that effect at trial." Coltharp maintains that the defendant's failure to supplement the interrogatory notifying him that the substitute expert witness would advance the avascular necrosis theory as an alternative explanation for Coltharp's loss of use of his right shoulder deprived him of the opportuniy to cross-examine Dr. Morris adequately regarding various factors relating to avascular necrosis, such as the malady's genesis, gestation period, and methods of treatment upon its diagnosis.

¶18. Dr. Carnesale however argues that on September 8, 1995, he served Coltharp with supplemental responses to plaintiff's interrogatories which identified the following:

1. [Coltharp] had an extensive previous history of syringomyelia including two previous surgeries;

2. The syringomyelia had caused weakness in both upper extremities and deceased sensation to the right upper extremity;

3 [Coltharp] was a known diabetic which affects the sensory nerves to the upper extremities;

4. The development of the Charcot joint of the right shoulder and the injury at work on February 15, 1993, were only part of [Coltharp]'s overall picture;

5. The development of the Charcot joint of the right shoulder was only one aspect of a complex continuous type of injury due to decreased sensation to the joint;

6. When [Coltharp] began to lose sensation of the upper extremity and had any type of trauma to his right shoulder joint, he was likely to develop the Charcot joint; and

7. The appropriate treatment of [Coltharp]'s right shoulder was an exercise program in order to maintain some mobility of the shoulder and this was true whether [Coltharp] had an impaction fracture, no impaction fracture, a normal joint, an abnormal joint, a normal neurological exam or an abnormal neurological exam.

¶19. Dr. Carnesale maintains that Dr. Morris' testimony was consistent with this summary of the expected opinions and testimony of the expert as set forth in Dr. Carnesale's interrogatory responses. Carnesale further maintains that he has consistently urged that the plaintiff's right shoulder problem was caused by the progression of the plaintiff's underlying and pre-existing disease, syringomyelia, and not caused by the range of motion exercises he prescribed. Carnesale points out that Dr. Morris testified that the Charcot shoulder joint or frozen shoulder joint was caused by the altered nerve supply of the spinal cord due to the syringomelia. Due to the neurovascular situation of the right shoulder joint caused by the syringomyelia, a

large segment of the humeral head of the right shoulder joint broke off when the plaintiff lifted the drum. The arthropathy of the shoulder or Charcot shoulder resulted. Dr. Morris opined that the Charcot shoulder joint was part of the overall picture of syringomyelia and that, without the pre-existing syringomelia, the plaintiff would not have developed a Charcot shoulder joint. Dr. Morris further testified that the appropriate treatment for a Charcot shoulder joint is the program of range of motion exercises which was prescribed by Dr. Carnesale in an attempt to maintain some mobility of the shoulder joint.

¶20. Furthermore, Dr. Carnesale asserts that Coltharp's complaint regarding the late date of Dr. Morris' identification ignores the fact that Coltharp opposed the Defendant's Motion to Reschedule Trial Date. Accordingly, in face of Coltharp's opposition to rescheduling, the trial court gave Coltharp the choice of either consenting to the continuance request or allowing Dr. Carnesale to obtain a substitute expert witness in the short time frame. Coltharp opted for the latter. Coltharp opposed the defendant's request for continuance two weeks prior to trial. Since Coltharp was not willing to consent to a continuance, substitution of the expert witness two weeks prior to trial was the only option left. Accordingly, Dr. Carnesale was under a very strict time frame in trying to find a substitute expert witness that would be available on the trial date and to supplement his original interrogatory responses. However, two previous settings existed, and both parties agreed to the final trial date set by the trial court. Thus, we cannot hold Coltharp's opposition to the motion for a continuance against him, because it did not relieve Carnesale of his duty to supplement his interrogatories to the extent that he should have included the term "avascular necrosis."[5]

¶21. Coltharp also alleges that the trial court erred in admitting Dr. Ellis' testimony and in admitting Dr. Carnesale's testimony regarding syringomyelia. Specifically, Coltharp asserts that Dr. Ellis' name was not timely submitted and that the authority upon which Dr. Carnesale based his testimony regarding syringomyelia was not provided as a part of discovery.

## Dr. Ellis' Testimony

¶22. In his reply brief, Coltharp alleges that the trial court erred in admitting Dr. Ellis' testimony at trial. Specifically, Coltharp points out that on May 2, Carnesale listed Dr. Nancy Ellis, Radiologist, as an expert witness. Coltharp asserts that he did not receive the response listing the expert until approximately May 5, which would have been seven (7) days before trial which was scheduled to begin on May 12, 1997. Coltharp argues that the trial court's allowing this testimony amounted to trial by ambush since her opinions had never been divulged in any previous interrogatory answer. We agree.

¶23. In *Huff v. Polk*, 408 So.2d 1368 (Miss. 1982), we held that a doctor's failure to disclose the names of three expert witnesses until immediately prior to trial violated the then applicable discovery statute, Miss. Code Ann. § 13-1-226.[6] There, shortly before the trial began on February 18, 1981, one of appellee's attorneys handed appellant's attorney the supplemental answers to interrogatories listing two doctors that would be called as experts and orally advised that another might be called. Huff filed a motion to exclude the testimony of the proposed expert witnesses as their names were not divulged until the day of the trial and her attorney had no chance to prepare as far as they were concerned. *Id*. at 1369. In applying the statute and the rule, we said:

> [T]he rules of Court are supposed to be for the purpose of promoting justice and fair play. If a member of the bar intends to try cases in court, he is presumed to know the rules. The [rules] hereinabove quoted are clear, concise, plain and could not possibly be misinterpreted. If rules are

going to be promulgated, they cannot apply to different cases in a different manner.

*Huff v. Polk*, 408 So.2d 1368, 1371 (Miss. 1982).

¶24. In the instant case, the problem lies in the May 2 supplemental answer to Interrogatory No.3 in that it contains the first reference to the use of Dr. Ellis as an expert. In fact, Dr. Carnesale states in the supplemental response that "[t]he defendants have not contacted Dr. Ellis and do not know the full nature of her testimony. However, it is anticipated that she would interpret the X-ray films taken from the plaintiff while in the Baptist-Union County Hospital emergency room." Carnesale's counsel failed to notify Coltharp's counsel of Ellis' status as an expert testifying or of Ellis' opinions until a mere seven (7) days before trial. Despite these errors, the trial court allowed Ellis to testify.

¶25. In *Jones v. Hatchett*, 504 So.2d 198 (Miss. 1987), four (4) days notice was insufficient to discharge duty imposed by Rule 26(f) to supplement interrogatory answers where the supplement did not also reveal the substance of the testimony of the expert. *Id.* at 201. Therefore, in accord with *Huff* and *Jones*, we find that the trial court erred in allowing the testimony of Ellis, because the seven (7) days notice given was insufficient to satisfy Rule 26(f).

## Basis of Dr. Carnesale's Testimony

¶26. Regarding "trial by ambush," this Court has said:

> We have long been committed to the proposition that trial by ambush should be abolished, the experienced lawyer's nostalgia to the contrary notwithstanding. We have sought procedural justice through a set of rules designed to assure to the maximum extent practicable that cases are decided on their merits, not the fact that one party calls a surprise witness and catches the other with his pants down. One of the most obviously desirable and rigidly enforced of these rules is that requiring pre-trial disclosure of witnesses.

*Harris v. General Host. Corp.*, 503 So.2d 795, 796-97 (Miss. 1987). There, we held the plaintiff, by filing the appropriate interrogatories, acquired a procedural right to the name of the expert witness "sufficiently in advance of trial" to afford plaintiff and his counsel "a reasonable opportunity to prepare to meet and cross-examine the evidence to be offered." *Id*. at 798.

¶27. In the instant case, interrogatories were filed in 1994 that sought information regarding Carnesale's testimony and Carnesale's experts and their testimony. Coltharp's attorney did not file a Motion to Compel, but instead waited until trial to object to the expert's testimony based upon inadequate discovery. Although no Motion to Compel was filed, neither Carnesale's original answers nor his supplemental answers put Coltharp on notice of the avascular necrosis theory relied upon at trial. Thus, Coltharp cannot be expected to ask the court to compel discovery of a theory unknown to him. The testimony admitted by the trial court in this regard amounts to "trial by ambush." In accord with *Harris*, we reverse and remand for a new trial.

## II. THE COURT COMMITTED ERROR IN REFUSING TO GIVE PLAINTIFF'S JURY INSTRUCTIONS P-12 AND P-16.

¶28. Coltharp alleges that the trial court committed reversible error in failing to grant plaintiff's jury instructions P-12 and P-16. These proposed instructions state as follows:

You are instructed that it is the law of Mississippi that a party to a suit may admit negligence in the form of written admissions or oral admission to the Plaintiff, Michael Coltharp, or any other person.

If you find from the evidence presented in this case that Dr. Carnesale admitted he negligently treated Michael Coltharp and if you further find that the admission of negligent treatment, if any, proximately caused injuries and damages to Michael Coltharp, then it is your duty to return a verdict for Michael Coltharp for such damages you determine adequately compensate him.

P-16

An admission in a legal proceeding such as this by one of the parties means that those facts are presumed to be proven and true. If you find from the evidence in this case that Dr. Carnesale admitted his negligence by either his medical records, which have been introduced into evidence, or his testimony, then it is your sworn duty to find in favor of the Plaintiff, Michael Coltharp, if you additionally find that the admission of negligence, if any, proximately caused his damages.

¶29. Coltharp maintains that Dr. Carnesale admitted negligence by dictating the following statement into his medical records: "I feel a bit remiss in not recognizing the underlying nature of the problem before." Additionally, Coltharp points out that "Dr. Carnesale then read into the record Webster's Dictionary's definition of the word (remiss): Number 1, neglect in the performance of work or duty, careless; two, showing neglect or inattention." Therefore, "Coltharp urges that this legal admission in the medical records and court testimony required the trial court to instruct the jury regarding the significance of an admission by a party."

¶30. Coltharp relies on this Court's decision in *Meena v. Wilburn*, 603 So. 2d 866 (Miss. 1992) for his assertion that the trial court should have admitted above referenced instructions. In *Meena*, "[t]he judge granted [the plaintiff's request for two **peremptory** instructions on liability] simply because [the defendants] admitted that they 'deviated from the standard of care' with which they should have complied." *Id.* at 869 (emphasis added). On the other hand, Carnesale argues that *Meena* is distinguishable from the case at bar because "Dr. Carnesale consistently denied that he negligently treated the plaintiff and denied that his treatment was the cause of the injuries sustained by the plaintiff."

¶31. In *Meena* this Court noted,

[i]ndeed, throughout this case, [the defendant doctor] *admitted* to *breach* of a *duty* to which he was bound. He made the admissions: (1) *in his answer* to [the plaintiff's] complaint; (2) *in his opening statement*; (3) *through his testimony*; (4) *through his objections*; and (5) *during the debate over jury instructions*.

*Id.* at 870 (citations omitted).

¶32. This Court finds that jury instructions P-12 and P-16 were correct statement of law and should have been granted. The two instructions were not peremptory in nature. Rather, the jury was instructed that **if** the evidence proved that Carnesale admitted negligence and **if** the admission of negligence was the proximate

cause of Coltharp's injury then it was the duty of the jury to return a verdict in favor of Coltharp. In light of Carnesale's statement that he felt "a bit remiss in not recognizing the underlying of the problem," there was sufficient evidence presented at trial to establish a jury question as to whether Carnesale made an admission. Accordingly, we reverse and remand the trial court's decision.

## CONCLUSION

¶33. Coltharp alleges that the following trial court decisions regarding the admission of testimony constituted trial by ambush: (1) Dr. Morris' testimony regarding "avascular necrosis;" (2) Dr. Ellis' testimony; and (3) the basis for Dr. Carnesale's testimony regarding syringomyelia. We hold that Carnesale's efforts at supplementation fall short of satisfying Rule 26(f).

¶34. Additionally, Coltharp alleges that the trial court committed reversible error in failing to grant plaintiff's jury instructions P-12 and P-16, which deal with admissions by Dr. Carnesale. We agree, because there was sufficient evidence presented at trial to establish a jury question as to whether Carnesale made an admission.

¶35. Accordingly, the trial court's decision is reversed and remanded.

¶36. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, ROBERTS AND WALLER, JJ., CONCUR. MILLS, J., NOT PARTICIPATING.**

1. Dr. Carnesale's notes indicate that Coltharp was seen on April 4, 1993. However, testimony at trial established that the correct date was in fact April 7, 1993.

2. Dr. Carnesale's notes further indicate that development of Charcot joint at the shoulder is not completely unexpected since Coltharp has a known syringomyelia of the cervical spine.

3. Coltharp originally identified the following as a third issue: "THE TRIAL JUDGE'S FAILURE TO ALLOW THE PLAINTIFF TO BE RECALLED AS THE ONLY REBUTTAL WITNESS FOR BRIEF TESTIMONY IN ORDER TO REBUT DR. MORRIS'S OPINIONS ABOUT MECHANISM OF INJURY AND PREEXISTING PROBLEMS WAS AN ABUSE OF DISCRETION." However, this issue was withdrawn by Coltharp in his Reply Brief.

4. Dr. Shelton was scheduled to be out of the country on the date that the trial was re-scheduled.

5. "Avascular necrosis" revolves around the syringomyelia and the decreased sensation in the shoulder associated with the destruction of vessels in the shoulder joint.

6. The statute has now been repealed, but Miss.R.Civ.P. 26 has basically adopted the language of the statute. In pertinent part, Rule 26 states:

(4) Trial Preparations: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

....

(f) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons (i) having knowledge of discoverable matters, or (ii) who may be called as witnesses at the trial, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.