GRIFFIS, P.J.,
for the Court:'
. ¶ 1. Della and Roy Sumrall filed a medical-malpractice claim against Singing River Health System (Singing River). After a bench trial, the trial court entered a judgment in favor of Singing River. The Sum-rails appeal the judgment and argue that: (1) Singing River’s expert witness should not have been allowed to testify on the nursing standard of care; (2) the court erred in denying the Sumralls’ motion for partial summary judgment on the standard of care; (3) the trial court applied.the wrong burden of proof; (4) the judgment was against the overwhelming weight of the evidence; and (5) cumulative error necessitates reversal. We find reversible error and remand this case to the Circuit Court of Jackson County for further proceedings.
FACTS AND PROCEDURAL HISTORY
¶2. On February 23, 2012, Della was admitted to Ocean Springs Hospital[1] with a complicated case of acute cholecystitis, or inflammation of the gallbladder. Dr. Edward Dvorak, a general surgeon, recommended removal of Della’s gallbladder and subsequently ordered a central line be placed in her external jugular vein. A “central line” refers to a central venous access device placed into a large vein in the patient. It is used to provide the patient with medicine, nutrients, fluids, or blood products. Della’s treatment was completed without further complications.
¶ 3. On February 29, 2012, Della was scheduled for discharge., Prior to her discharge, Chequita Steele, an OSH registered nurse, monitored Della. Nurse Steele testified that Della had previously complained of the inability to breathe when lying flat on her back and preferred to sit up. In addition to her problem with her gallbladder, Della had chronic pulmonary obstruction disease (COPD) and a partially collapsed lung, among other health problems.
¶ 4. Nurse Steele testified that Della had been reclining in a chair in her hospital room at an angle of less, than ninety degrees-speeifically “somewhere in between 30 [degrees] and 45 [degrees]. Probably closer to 45 [degrees].” Nurse Steele talked with Della about the need to remove the central line and the removal process. Thereafter, Nurse- Steele removed the dressing that - covered the insertion site and cut the sutures - holding the line in place. Nurse Steele then instructed Della to perform the Valsalva maneuver while *664 Steele applied pressure to the site with gauze and removed the central line. The Valsalva maneuver requires the patient to take a deep breath, hold it, and bear down.
¶ 5. Nurse Steele then testified that she held pressure on the exit site for approximately one minute. At that point, Della began gasping for breath, and she said, “I can’t breathe.” Della then became unresponsive.
¶6. Della was given emergency treatment in her room. Then, she was taken to the OSH intensive-care unit. Della suffered anoxic brain damage and permanent impairment. Della was discharged from OSH on March 29, 2012. The discharge instructions included information on treating a stroke.
¶ 7. On May 18, 2012, the Sumralls filed a medical-malpractice claim against Singing River and OSH. The complaint alleged that Nurse Steele improperly removed Della’s central line, which caused an air embolus, cardiopulmonary arrest, and anoxic brain damage.
¶ 8. Because Singing River is a governmental entity, the Mississippi Tort Claims Act governs the Sumralls’ claims. As required, the trial court held a bench trial from December 9 through December 11, 2013. On April 29, 2014, the trial court entered its findings of fact and conclusions of law. The trial court ruled in favor of Singing River and found that there was no nursing standard of care in the removal of a central line. Thus, the trial court concluded that Singing River did not violate any standard of care. On May 4, 2014, the trial court entered a final judgment. It is from this judgment the Sumralls now appeal.
ANALYSIS
¶ 9. The Sumralls’ appeal has raised five separate issues. Central to three of the issues is a challenge to the admission of the opinion evidence of Singing River’s expert — Dr. James E. Corder. After considering the issues raised, we have combined these issues under the Sumralls’ challenge that the trial court’s findings were against the overwhelming weight of the evidence and find this issue dispositive.
¶ 10. The standard of review for a judgment rendered after a bench trial is well settled. “ ‘A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,’ and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.” City of Jackson v. Brister, 838 So.2d 274, 277-78 (¶ 13) (Miss.2003) (quoting Maldonado v. Kelly, 768 So.2d 906, 908 (¶ 4) (Miss.2000)). In addition, we must “recognize[ ] that the trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses.” City of Jackson v. Lipsey, 834 So.2d 687, 691 (¶ 14) (Miss.2003).
¶ 11. The trial court ruled in its findings of fact and conclusions of law:
[Della] was set to be discharged from [OSH] on February 29, 2012[,] to a comprehensive rehabilitation center. Nurse Chequita Steele, an employee of [Singing River,] was in charge of preparing [Della] for discharge. At a couple of points in the nursing notes from Nurse Steele, she noted that [Della] was sitting in a bedside chair in a position less than 90 degrees. Nurse Steele testified that [Della] was in the same type position when she removed [Della’s] central line. Nina Musgrove, [Della’s] daughter, disagreed “with Nurse Steele’s assessment of [Della’s] positioning at the time of the central line removal.”
Nurse Steele explained the central line removal procedure to [Della], [and] had *665 her take a deep breath and then bear down (the [V]alsalva maneuver) as she removed the line. It appeared that [Della] understood and complied with the instructions she was given. Once the line was removed, Nurse Steele applied pressure to the wound site. Almost immediately after the central line removal, [Della] began experiencing .distress, was gasping for air[,] and became unresponsive. Nurse Steele called for assistance, and the response team entered the room to administer care and take [Della] to [the] ICU. Based upon the testimony and medical records!,] it appears as though there is a disagreement as to the cause of the [Della’s] distress. It was either an air embolism or perhaps a cardiac event along with a stroke.
The [Sumralls] presented two experts, Dr. Lidgia Vives and Nurse Crystal Keller, to offer evidence as to the nursing standard of care regarding patient, positioning. during central line removal. Both of [the Sumralls’] experts testified that the generally accepted standard of care for central line, removal required the following: the nurse should educate the patient about the procedure; place the patient in the Trendelenb[u]rg position, which is described as having the patient in a supine position where the site of the central line insertion is below the heart; have the patient take a deep breath, hold and bear down (the [Vial-salva maneuver); then, at removal, place gauze with pressure at the removal site. Both experts further agreed that if a patient were unable to tolerate the Trendelenb[u]rg position for whatever reason (breathing difficulty in that position or intracranial pressure), that a position other than and at less of an angle was acceptable to perform the central line removal. They did,' however, testify!] that there was no indication that [Della] could not tolerate the Trende-lenb[u]rg position at the time Nurse Steele removed her central line in preparation for her discharge to the rehabilitation facility!.]
[Singing River] offered the testimony of Dr. Jim Corder. He opined that as to the applicable standard of nursing care for positioning a patient to remove a central line, there was none. Based upon his knowledge and experience, the literature and the fact that hospital policies from across the country on this issue varied widely, no one position of a patient during central line removal was so overwhelmingly required, .that there truly was no uniformity that would equate to a standard of care to be followed by nurses. Furthermore, it was noted in Nurse Steele’s testimony that [Della] was unable to tolerate the Tren-delenb[u]rg position due to some difficulty breathing while in that position. Based upon the preponderance of the evidence presented for the Court’s consideration, the Court finds as a matter of fact that there is no recognized applicable standard of nursing care with regard to ■patient positioning during the removal• of a central line. The widely varying literature and policies clearly demonstrate that some recline during the removal process -is preferred, but it also depends on the' condition and tolerance of the individual patient.
(Emphasis added).’
¶ 12. While there are additional findings and conclusions, we stop at this point in the trial court’s findings to begin our consideration. The ■ Sumralls challenge several findings by the trial court, but we find that there are two that are essential to our review. First, the Sumralls claim that Dr. Corder should not have been able to testify that there was no applicable standard of care. Second, the Sumralls *666 contend that Dr. Corder should not have been allowed to testify that Della suffered a stroke.
¶ 13. Both in the pretrial expert witness disclosures and at trial, the Sumralls’ expert witnesses testified that the applicable standard of care for a registered nurse removing a central line consisted of four key steps:
1. Educate the patient about the procedure;
2. Place the patient in the Trendelen-burg position (lying on her back with her üpper torso inclined downward "so the central line insertio'n site is below the heart);
3. Perform the Valsalva maneuver (have the patient take a deep breath and bear down);
4. Upon removal, apply pressure and impermeable gauze at the .site of removal.
¶ 14. • Here, we are concerned with the second step, i.e., the proper positioning of the patient. We also note that there was testimony that the removal of a central line may be done by. both nurses and doctors. Thus, there was no testimony that the standard of care for the removal of a central line would be different depending on the type of medical professional. So we reject the allegation that Singing River failed to present evidence of a separate nursing standard of care. There was absolutely no evidence that a doctor or a nurse would remove a central line differently.
. ¶ 15. Dr. Vives. and Nurse Keller explained that the. proper positioning of the patient was medically necessary because ambient air pressure is greater than venous blood pressure above the heart, and an open hole can be a pathway for air to enter the venous system. They also testified that these standards of care were well known and supported by voluminous medical literature. For example, Johns Hopkins Hospital’s policy and procedure states that use of the Trendelenburg position for removal of central lines is imperative.
¶ 16. The Sumralls also offered Della’s medical records while at Singing River, which read:
Nurse Note: 16:45, Katy Lorenzo: rapid response called on 2 East. Patient sitting up in chair unresponsive to verbal command.
Dr. Rodberg (pulmonologist): Apparently while seated in the chair, the patient’s central line was removed.
Dr. McShurley (internal medicine): Shortly prior to discharge, the patient’s central line was removed. Apparently was sitting in a chair and ... became unresponsive. ...
Dr. Rodberg (pulmonologist and employee of Singing River Health System): Impression: (1) probable air embolus from removal of central line[;] (2) near respiratory arrest[;] (3) shock secondary to air embolus.
Dr. Karcher (neurologist): It is suspected that she may have had an air embo-lus due to removal of the central line. Assessment: possible anoxic brain injury status post near respiratory arrest yesterday with subsequent myoclonic jerks.
Dr. Taylor (pulmonologist and employee of Singing River Health System): probable air embolism with resultant cardiovascular collapse and possible anoxic brain injury.
Dr. Roth (internal medicine and employee of, Singing River Health System): She had a little bit of air embolus associated with the venous process resulting in near cardiopulmonary arrest.
Dr. McShurley (internal medicine and employee of Singing River Health Sys *667 .tem): (3/4/12) shock probably due to air embolism resulting in cardio-vascular collapse secondary to removal of central line in the upright position.
Dr. Taylor (pulmonologist and employee of Singing. River Health System): probable air embolism with resultant cardiovascular collapse.
(Quotations omitted).
¶ 17. The -Sumralls also point to the testimony of OSH nurse Jenna Blaine. Nurse Blaine testified-that she removed a second central line from Della on March 19, 2012, just twenty days after the February 29, 2012 incident, while accompanied by a Singing River “patient care representative” who was present precisely to assure the procedure was done correctly. Nurse Blaine explained that she placed Della in-the Trendelenburg position, removed the central line, and applied pressure. The Sumralls contend that this was consistent with the exact steps that their experts and the applicable-medical literature stated was the applicable nursing standard of care.
¶ 18. The Sumralls introduced the sworn deposition of Dr. John Weldon, a hospitalist and full-time employee of Singing River. Dr. Weldon was not on duty on February 29, 2012, but he rendered care to Della during her hospital stay. Dr. Weldon -had made a one-line entry in Della’s voluminous medical record. On March 5, 2012, several days after the central-line incident, he -wrote — “I think she had a stroke.” Then, in his deposition, Dr. Weldon explained that he had no opinion on the etiology of Della’s condition, that the root cause could well be air embolism, and that his later entry in the medical record referencing a stroke was simply meant to document that stroke was part of his differential diagnosis. Dr. Weldon confirmed there were no test results that confirmed a stroke, that he was not offering an opinion that Della had a stroke, and-that, he had.no opinion as to whether stroke or air embolism was,more probable. He was asked what he would.do if he saw a Singing River .nurse.getting ready to pull a central line from a patient sitting up in. a chair; Dr. Weldon testified, “I would stop her.” When asked ■ why, he stated, because “that’s not the right way to do it.” .
IT 19. To counter the Sumralls’ expert opinions, Singing'River called Dr. Corder. Dr. Corder is board certified in internal medicine and anesthesiology. His practice is ás an intensivist, which he described as a subspecialist in ‘critical-care medicine, basically directing intensive-care units, and caring for patients in them.
¶ 20. Over the Sumralls’ objections, Dr. Corder was allowed to testify that Nurse Steele “did not breach the standard of care,”, and that “there is no national standard of care.” He also was allowed to opine, over an objection, that “Dr. Weldon thought she had a stroke and I think she had a stroke.” Dr. Corder admitted he had never read Dr. Weldon’s deposition and did not know that Dr. Weldon stated under oath he had no opinion as to whether Della had, a stroke. The Sumralls’ objection was that Singing River’s pretrial disclosure^ of Dr. Corder’s opinions did not state that Dr. Corder would (a) identify the nursing standard of care, (b) testify that Della had a stroke, or (c) testify that Della had a heart attack.
¶ 21. After the objection; the trial court took a recess ■ to review Singing River’s expert designation-and disclosures. . The trial court- then sustained the objection to Dr. Corder testifying that Della had a heart attack, -but allowed Dr. Corder to testify that he thought “she had a stroke” and that Nurse Steele did not breach the nursing standard of eare. The Sumralls argue that this was further confused by Dr, Corder’s testimony, that there was “no *668 national standard of care for-positioning or for removal of a central line,” and that the procedures used by Nurse Steele in removing the central line from Della were simply “techniques to optimize removal of a central line.”
¶22. The Sumralls challenge the decision by the trial court to allow Dr. Gorder’s testimony that was not consistent with his pretrial disclosures. The standard of review for the admission or exclusion of evidence, such as expert testimony, is abuse of discretion. Barrow v. May, 107 So.3d 1029, 1034 (¶ 10) (Miss.Ct.App.2012). This Court will not overturn the trial court on an evidentiary issue unless the trial court abused its discretion or was clearly erroneous. Worthy v. McNair, 37 So.3d 609, 614 (¶ 13) (Miss.2010).
¶23. In Canadian National/Illinois Central Railroad v. Hall, 953 So.2d 1084, 1097 (¶¶ 43-44) (Miss.2007), the supreme court ruled:
[O]ur rules of civil procedure require that a party must disclose the name of each expert expected to be called as a witness at trial, the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify[J and a summary of the grounds for each opinion. M.R.C.P; 26(b)(4)(A)( [i]). When a discovery violation occurs, one of the sanctions available under our rules of civil procedure is “an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.” M.R.C.P. 37(b)(2)(B). This Court has stated that “[a]n expert should- not be allowed to testify concerning a subject matter which is not included in the response to the interrogatory,” and allow-anee of such would be reversible error. Buskirk v. Elliott, 856 So.2d 255, 264 [ (¶ 25) ] (Miss.2003).
Compliance with the rule involves a fact-intensive comparison between the subject matter contained in discovery responses and the subject matter of the testimony given by the expert at trial. Id. This Court has found discovery violations and subsequent exclusion of expert testimony to be proper when the experts testified as to a subject matter different from the subject matter contained in discovery responses. See, e.g., Coltharp v. Carnesale, 733 So.2d 780, 786 [ (¶ 27) ] (Miss.1999) (trial court committed reversible error by admitting expert testimony supporting additional theory of plaintiffs injury not revealed during discovery); T.K. Stanley Inc. v. Cason, 614 So.2d 942, 950-51 (Miss.1992) (trial court erred in admitting expert testimony regarding permanent disability, as it was a separate subject matter from causation). However, this Court has established that “where the stated subject matter in the response necessarily includes the subject matter testified to at trial, it is an abuse of discretion to exclude the expert’s testimony.” Buskirk, 856 So.2d at 264 [(¶ 25)].
¶ 24. We have carefully examined Singing River’s pretrial disclosures about Dr. Corder’s testimony. According to the disclosure, Dr. Corder was to testify “that Nurse Steele’s removal of [Della]’s central line was within the applicable nursing standard of care.” It was also disclosed that he would testify “regarding the policies and procedures of Singing River Health Systems in the placement and withdraw of central lines.”
¶ 25. The disclosure indicated that Dr. Corder would testify that the removal of the central line was “within the applicable nursing standard of care.” This implies that there is an “applicable ... standard of *669 care.” If Dr. Corder was to testify as to a standard of care that was different from the' standard of care claimed by the Sum-rails, Rule 26(b)(4)(A)(i)' required that Singing River state the substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for each' opinion'. Dr. Corder’s disclosure certainly did riot state, as he testified, that “there is' no national standard of care.” As such, we find Dr. Cord-er’s testimony to be in conflict with the disclosures, and we conclude it was error to allow Dr. Corder to testify that “there is no national standard of care” for patient positioning for the removal of a central line.
¶ 26. Likewise, .the disclosure also stated that Dr. Corder would testify “regarding the policies and procedures of Singing River Health Systems in the placement and withdraw[al] of central lines.” Yet, in his testimony, Dr. Corder did not testify as to or offer any such policy or procedure for Singing River. Thus, we find his testimony was not consistent with the disclosures, and the disclosures did not state the substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for each opinion as required by Rule 26(b)(4)(A)(i). As such, we conclude it was error to allow Dr. Corder to testify that “there is no national standard of care” for patient positioning for the removal of a central line.
¶ 27. Also, the Sumralls challenge the admission of Dr. Corder’s opinion that “Dr. Weldon thought she had a-stroke and I think she had a stroke.”' Dr. Weldon did not testify that Della had a stroke. Thus, there was no factual bastí to support Dr. Corder’s statement on Dr. Weldon’s opinion. Also; Dr. Corder’s' disclosures stated that he would testify “that it is highly improbable [Della] suffered from an air embolus. Furthermore, .Dr. Corder will opine that, even assuming an air embolus occurred, it is a known complication of central line removal.”[2]
¶ 28. Dr. Corder’s designation does not mention that he would opine that Della hád a “stroke.” It does indeed state “that it is highly improbable [she] suffered from an air embolus,” but it does not disclose he would testify she suffered a stroke. Without mention of the stroke, we must also determine that — as to the opinion that Della suffered a “stroke” — the disclosures did not state the substance of the facts and opinions to which the expert was expected to testify and a summary of the grounds for ..each opinion- as required by Rule 26(b)(4)(A)(i). As such, we find Dr. Cord-er’s testimony to -be in conflict -with the disclosures, and we conclude it was error to allow Dr. Corder to testify, “Dr. Weldon thought she had a stroke and I think she had a stroke.”
¶ 29. Therefore, we find that the trial court abused its discretion in allowing Dr. Corder to testify inconsistent with, outside of, and beyond his designation. First, we find that the trial court’s finding that “as a matter of fact ...- there is no recognized applicable standard of nursing care with regard to patient positioning during the removal of a central line” and “without an applicable standard of care, there can be no breach of such,” was not supported by substantial, credible, and reasonable evidence. Second, we find that the trial court’s finding that “[i]t was either an air *670 embolism or perhaps a cardiac event along with a stroke” was not supported by substantial, credible, and reasonable evidence.
¶ 30. Further, we find that the Sumralls offered expert testimony, supported by extensive medical literature, to indicate that there was a standard of care for a nurse to remove a central line. We recognize that the standard of care may include some variation in the proper positioning of the patient depending upon,her condition. However, the trial court’s finding that there is no standard of care is against the overwhelming, weight of the evidence and must be reversed. Hence, we reverse the trial court’s judgment and remand for further proceedings consistent with this opinion.
¶ 31. In addition, we recognize that the Sumralls have also challenged a number of the trial court’s, discovery and pretrial rulings under the issue they refer to as “cumulative error.” Because we have decided to reverse and remand this case for further proceedings, we find the issues raised in the cumulative-error section are now moot. Furthermore, we are of the opinion that the Sumralls have raised these issues only as to .the finding of cumulative error and do not ask this Court to reverse the trial court’s ruling on each of the individual issues. Had the Sumralls so intended, they would have provided citations to legal authority, and included these as separate issues. As a result, we make no ruling as to these separate issues.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
LEE, C.J., IRVING, P.J., BARNES, MAXWELL, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. WILSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY ISHEE, J.

. Singing River is the'owner and operator of Ocean Springs Hospital (OSH). For purposes of this appeal,, both will be referred to with the understanding that Singing River and OSH are the same legál entity.

. In the second amended designation of expert witnesses, Singing River added that "Dr. Corder will be offered to contradict any opinions on standard of care and/or' causation as stated in the depositions of Plaintiffs' experts, Dr. Ladgia Vives and Crystal Keller, R.N.” However, Singing River did not offer any further explanation on the.contradictions that were intended to be part of Dr. Corder’s testimony.