# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01509-SCT

*FRANCES BUSKIRK, RONNY VAN BUSKIRK AND
MIKE VAN BUSKIRK ON BEHALF OF THE
WRONGFUL DEATH HEIRS OF J.C. BUSKIRK,
DECEASED*

*v.*

*JOHN P. ELLIOTT, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/3/2001 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GRADY F. TOLLISON, JR. |
| | BARBARA MILLER DOLLARHIDE |
| | LEROY DAVIS PERCY |
| | JOSEPH E. ROBERTS, JR. |
| ATTORNEYS FOR APPELLEE: | S. DUKE GOZA |
| | DION JEFFERY SHANLEY |
| | SHELBY KIRK MILAM |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 08/07/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. This wrongful death action was brought in the Circuit Court of Lee County against Dr. John P.

Elliott, Dr. Benton Hilbun, and the North Mississippi Medical Center. Dr. Hilbun was dismissed by

summary judgment. Trial commenced, and North Mississippi Medical Center was dismissed with prejudice

by agreed stipulation with the wrongful death beneficiaries of J.C. Buskirk. The trial then proceeded

against Dr. Elliott alone. After hearing testimony, reviewing the evidence, and deliberating, the jury returned a verdict in favor of Dr. Elliott. The trial court denied motions for a directed verdict, judgment notwithstanding the verdict, and new trial, and the beneficiaries now appeal.

## FACTS

¶2. On June 7, 1992, J.C. Buskirk (Buskirk) was admitted to the North Mississippi Medical Center (NMMC) to undergo surgery to remove a suspected cancerous mass on one of his lungs. Dr. Benton Hilbun performed the successful surgery the next day and left orders with the hospital staff to use a catheter if Buskirk experienced problems urinating. The day following the surgery, Buskirk did have difficulty urinating. Two experienced nurses attempted to insert a catheter into Buskirk's bladder but were unsuccessful. On their attempts, the catheter would go no further than about two inches into Buskirk's urethra before halting. They contacted the surgical resident who attempted the procedure but met with the same results. The surgical resident then contacted the urologist on call that day, Dr. John P. Elliott.

¶3. After arriving at the hospital, Dr. Elliott found Buskirk lying on his bed with blood dripping from his penis. According to Dr. Elliott's testimony, this indicated a tear had been made in the urethra. On his first attempt, Dr. Elliott completely inserted the catheter, but was unsuccessful in reaching the bladder. His next attempt utilized a rigid instrument called a guide to keep the catheter from stopping, but this attempt was unsuccessful as the guide met with a blockage in the urethra. Dr. Elliott then used "filiformes," tiny threads used to pass through and dilate narrow urethral openings, in an attempt to widen the blockage to allow the catheter access to the bladder. Three attempts with the first filiform were unsuccessful in reaching the bladder. The fourth attempt, however, was successful, and the blockage was widened by follower filiform threads which attached to the end of the first. Once the urethra passage was wide enough to accommodate the insertion of the catheter into the bladder, Dr. Elliott removed the filiformes and

2

unsuccessfully attempted to insert the catheter into the bladder. His final attempt utilized the guide again, but this time the catheter reached the bladder and began evacuating urine. Dr. Elliott removed the guide and left instructions to leave the catheter in place for one day.

¶4.     When the catheter was removed, Buskirk again experienced difficulty urinating. There was pain over his bladder and blood in his urine. Dr. Hilbun asked Dr. Elliott to investigate the reasons for this difficulty, and Dr. Elliott's urology partner performed that task. During a cytoscopy (a procedure where a small flexible camera was inserted into Buskirk's urethra so the doctor could see the stricture restricting the flow of urine in Buskirk's urethra), he discovered a false passage in the wall of Buskirk's urethra. A false passage is an area which can be created when a catheter reaches a stricture in the urethra and cannot go further up the urethra but must go somewhere. A false passage does not necessarily indicate a puncturing of the urethra. After examining the urine in Buskirk's bladder (which was clear), he concluded that no further action was necessary. The next day, Buskirk's abdominal region was bloated, and he was experiencing pain around his stomach and bladder. When x-rays revealed the possible presence of air in Buskirk's retroperitoneal space (the area in the lower abdomen where the urethra, prostate, bladder, rectum, and a portion of the colon are found), Dr. Hilbun, with assistance from another urologist on call, performed a cystourethrogram (a.k.a. "cystogram"; where dye is injected into the urethra and bladder to highlight possible leakage points on x-rays). This procedure uncovered no leakage in either Buskirk's bladder or urethra.

¶5.     Dr. Hilbun next performed exploratory surgery which revealed Buskirk's retroperitoneal space was infected with bacteria. An infectious disease expert was summoned for consultation. A culture taken of the bacteria revealed its source to be the rectum or colon. After further exploratory surgery, no trauma or

infection was found in the perineum (the area between Buskirk's scrotum and rectum). Nor was there any sign of damage to that side of the colon.

¶6. Dr. Elliott, Dr. Hilbun, and the infectious disease expert explained to Buskirk's family that the infection was life-threatening, and they suspected its cause to be a puncture of the colon created during one of the attempts to insert a catheter into Buskirk's bladder. The infectious disease expert then explained how he was going to treat the infection. Buskirk's condition eventually deteriorated to the point where a colostomy was performed by Dr. Hilbun. During the surgery, he did not observe a hole in Buskirk's colon. Tragically, the efforts to save Buskirk's life were unsuccessful, and he died just over one month after being admitted for the cancer surgery.

¶7. Two years later, Buskirk's wrongful death beneficiaries, Frances Buskirk, Ronny Van Buskirk, and Mike Van Buskirk, filed this wrongful death suit. They served interrogatories on Dr. Elliott, including one which asked him to identify any expert witnesses whom he expected to call at trial. Dr. Elliott would respond and later file a supplemental response to this interrogatory. The full texts of the interrogatory and supplemental response, which are critical to the analysis of some of the issues in this case, are as follows:

**INTERROGATORY NUMBER 18:**

Please state the name, address and telephone number of each person whom you expect to call as an expert witness at the trial of this action. In addition, please state the subject matter on which each such expert is expected to testify, the substance of the facts and opinions to which each such expert is expected to testify and a summary of the grounds for each opinion.

**RESPONSE:**

Defendant John P. Elliott, Jr., M.D. will offer as an expert Dr. Bayard Tynes, a urologist from Birmingham, AL. Dr. Tynes' CV is attached hereto as Exhibit A. Dr. Tynes is of the opinion that the bacteria which precipitated the infection which Mr. Buskirk suffered is a bacteria which

4

came from fecal material either on Mr. Buskirk's bed, on Mr. Buskirk's penis or in Mr. Buskirk's penis. Dr. Tynes is of the opinion that the bed or Mr. Buskirk's penis or penile area was contaminated because of the proximity and lack of motion etc. He is of the further opinion that it was bacteria in the urethra channel. Dr. Tynes believes that the bacteria was simply pushed with the catheter during the catheterization. He feels that the catheter created the false passage and deposited the bacteria near the posterior of the prostate. He believes that the bacteria was then transmitted by the lymphatic system to the site where the infection was found.

Dr. Tynes strongly believes that the colon was never perforated in this case. This belief is reinforced by the fact that Dr. Hilbun wrote in his opt [sic] note that the area of infection was a non-foul smelling area. Dr. Tynes says that fresh fecal material is more than 50% anaerobic bacteria but he says that the anaerobes do not survive in the outside air therefore they were not carried alive back into the posterior of the prostate and subsequently into the retroperitoneal space.

No curriculum vitae was attached, contrary to what the supplemental response claims, and Dr. Tynes would later testify that he is not a urologist. As noted previously, Dr. Hilbun and NMMC were dismissed as parties and only the case against Dr. Elliott went to the jury for a verdict.

¶8. At trial, Dr. Elliott called Dr. Tynes to testify as an expert in infectious disease. The beneficiaries objected, and the jury was excused. During the hearing on the objection, the beneficiaries argued that Dr. Tynes's field of expertise–as stated in the interrogatory–was urology, not infectious diseases. The trial court instructed Dr. Tynes to speak with the beneficiaries' attorneys before the jury returned. No time limitation was set for the interview, and Dr. Elliott's counsel was instructed to provide a copy of Dr. Tynes's curriculum vitae to opposing counsel. However, the beneficiaries' counsel made a tactical decision not to interview Dr. Tynes and did not examine him during voir dire when he was tendered as an expert. The objection was overruled. The jury returned to the courtroom, and Dr. Tynes was allowed to testify concerning his theory of the cause of the bacterial infection which killed J.C. Buskirk. After his testimony,

the beneficiaries moved to strike it in its entirety. The motion was denied as was the beneficiaries' motion

for a directed verdict. After the jury returned a verdict for Dr. Elliott and judgment entered accordingly,

the beneficiaries moved the trial court for a judgment notwithstanding the verdict or for a new trial. This

motion was denied as well.

## DISCUSSION

**I.    WHETHER THE TRIAL COURT ERRED IN ALLOWING DR. TYNES TO TESTIFY FOR THE DEFENSE AS AN EXPERT IN THE FIELD OF INFECTIOUS DISEASES WHEN HE WAS IDENTIFIED IN DISCOVERY AS AN UROLOGIST.**

¶9.     In their first two issues raised on appeal, the beneficiaries allege that the trial court abused its

discretion when it permitted Dr. Tynes to testify at trial in spite of an arguable discovery violation. This first

issue concerns the misidentification in the supplemental interrogatory response of the field of expertise of

Dr. Tynes. The second issue concerns the scope of Dr. Tynes's testimony which the trial court allowed.

Dr. Elliott asserts that the trial court did not abuse its discretion when it allowed the testimony because the

misidentification was an unintentional mistake, and the trial court afforded the beneficiaries the opportunity

to interview Dr. Tynes before he was allowed to testify.

¶10.    Rule 26 of the Mississippi Rules of Civil Procedure governs discovery and states the following

concerning the identification of trial experts:

> A party may through interrogatories require any other party to identify
> each person whom the other party expects to call as an expert witness at
> trial, to state the subject matter on which the expert is expected to testify,
> and to state the substance of the facts and opinions to which the expert is
> expected to testify and a summary of the grounds for each opinion.

6

M.R.C.P. 26(b)(4)(A)(i).  The purpose of this rule, and generally of the rules of civil procedure, is "that trial by ambush should be abolished, the experienced lawyer's nostalgia to the contrary notwithstanding." *Harris v. General Host Corp.*, 503 So. 2d 795, 796 (Miss. 1986).  As explained in *Harris*:

> We have sought procedural justice through a set of rules designed to assure to the maximum extent practicable that cases are decided on their merits, not the fact that one party calls a surprise witness and catches the other with his pants down.

*Id.*

¶11.    Both Buskirk's beneficiaries and Dr. Elliott agree that the trial court is afforded considerable discretion when addressing discovery violations and will not be found in error absent abuse of that discretion.  *See Robert v. Colson*, 729 So. 2d 1243, 1245 (Miss. 1999); *McCollum v. Franklin*, 608 So. 2d 692, 694 (Miss. 1992).  They both assert that the trial court is to consider four factors before excluding evidence based upon a discovery violation:  the explanation for the transgression, the importance of the testimony, the need for time to prepare to meet the testimony, and the possibility of a continuance. *Miss. Power & Light Co. v. Lumpkin*, 725 So. 2d 721, 734 (Miss. 1998) (citing *Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 235 (5th Cir. 1981)).  With regard to each factor, this Court has stated:

> The first consideration involves a determination whether the failure was deliberate, seriously negligent or an excusable oversight.  The second consideration involves an assessment of harm to the proponent of the testimony.  The third and fourth considerations involve an assessment of the prejudice to the opponent of the evidence, the possibility of alternatives to cure that harm and the effect on the orderly proceedings of the court.

*Id.*  This Court has further stated:

> Exclusion of evidence is a last resort.  Every reasonable alternative means of assuring the elimination of any prejudice to the moving party and a

7

> proper sanction against the offending party should be explored before
> ordering exclusion.

*McCollum*, 608 So. 2d at 694. In their examinations of these factors, each side reaches understandably different conclusions concerning the necessity to exclude Dr. Tynes's testimony.

¶12.    The beneficiaries allege with regard to the first factor that the identification in the supplemental interrogatory of Dr. Tynes as a urologist, while not deliberate, is more than an excusable oversight. They characterize the answer as seriously negligent because Dr. Elliott could have remedied the mistake by submitting the response to Dr. Tynes for review before supplying them with it. They quote *Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385, 1389 (Miss. 1997) (quoting *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 107 (D.Md. 1989)), in support of their argument that a "false answer is in some ways more worse than no answer; it misleads and confuses the parties." Dr. Elliott responds that Dr. Tynes's designation as a urologist was a "drafting error," and the beneficiaries had over two years in which they could have moved to strike the response or requested a more definite answer or obtained the missing curriculum vitae. The beneficiaries counter that they should not be required to assume that the answers to interrogatories may be misleading or incorrect necessitating such motions, and it is not their responsibility to police the veracity of the answers.

¶13.    *Pierce* concerned responses to interrogatories which were knowingly false and can safely be categorized as deliberate. *Id.* at 1390 (the opinion uses the term "willful"). When asked by interrogatory if there were other eyewitnesses to the event where a ceiling fan fell upon an apartment resident injuring her knee, the plaintiff responded that she was alone when in fact a male guest was present and observed the incident. *Id.* at 1388. After falsely testifying during the first trial that she was alone, the plaintiff told the defendants in a deposition before the second trial that she was not alone. *Id.* The false testimony at the

8

first trial and discovery violations resulted in this Court's affirming the trial court's dismissal with prejudice of her complaint before the second trial. *Id.* at 1391. *Pierce*, while "the paradigm situation in which the plaintiff knowingly refused to be forthcoming and actively withheld the truth from the court," provides guidance only as to what constitutes a deliberate failure to disclose facts during discovery. *Id.* This is distinguished from what constitutes "serious negligence" as stated in *McCollum*.

¶14.    There is little doubt that Dr. Elliott was negligent in misidentifying the area of Dr. Tynes's field of practice. Dr. Tynes testified at trial that he was not a urologist and had not seen the interrogatory response where he was identified as such. Of the two parties, it was incumbent upon Dr. Elliott to insure the accuracy of his interrogatory response. However, the substance of Dr. Tynes's proposed testimony–as explained in the interrogatory response–concerned the belief that Buskirk's colon was not punctured, and that the source of the infection which killed him was an outside source inserted by means of the catheter through the urethra's false passage into the posterior of the prostate. The bacteria were then transported to the site of the infection. This necessarily involved a working knowledge of the bodily systems needed to produce this result. The substance of the interrogatory response indicates the expert testimony would cover these systems.

¶15.    Therefore, we conclude that since policing the veracity of a comprehensive interrogatory response should be the duty of the respondent, and the misidentification of the field of practice or expertise of the expert was Dr. Elliott's fault, serious negligence exists here. The explanation that the misidentification was a mere drafting error, while probably true, does not excuse Dr. Elliott from the need for specificity in identification of experts when considering the specialized nature of the medical profession. At the same time, we note that this one factor is not controlling of the issue even though it weighs in favor of the beneficiaries.

¶16. The second factor, the importance of the testimony of Dr. Tynes to Dr. Elliott's defense, is conceded by Buskirk's beneficiaries to weigh in Dr. Elliott's favor. They state that exclusion of Dr. Tynes's testimony would have been harmful to Dr. Elliott's defense.

¶17. However, they state that the third factor, the need for time to prepare to meet Dr. Tynes's testimony, weighs in their favor because the prejudice caused by Dr. Tynes's qualification and testimony as an expert in infectious diseases outweighed the importance of his testimony.

¶18. The importance of this misidentification cannot be easily overlooked when weighing this third factor because the beneficiaries allege they relied greatly upon the notion that Dr. Tynes would be qualified and testify as an expert witness in urology. The beneficiaries claim they made three tactical decisions due to this misidentification which resulted in prejudice to their case:

> (1) they chose not to prepare as much for the substance of Dr. Tynes's testimony because they believed an urologist would not be qualified to testify concerning how bacteria are transported through the lymphatic system;
>
> (2) they chose not to interview Dr. Tynes before his testimony because they wished to preserve the effect of their questioning on cross-examination for the jury; and
>
> (3) they chose to voluntarily dismiss NMMC during trial because they felt the case against Dr. Elliott was strong due to his perceived lack of a qualified expert.

Dr. Elliott counters that the beneficiaries had over two years in which they could have deposed Dr. Tynes, moved for a more definite response, moved for a continuance, or merely requested the missing curriculum vitae.

¶19. These tactical decisions notwithstanding, the language of Rule 26 focuses more upon the substance of the proposed expert testimony as opposed to the mere identification of an expert's field of practice or expertise. While these identifications play a role in the determination of how much an expert may testify and what area an expert's testimony may cover, misidentification alone, when the substance of the expert's

10

testimony is sufficiently clear from the response, is insufficient grounds to exclude the expert's testimony. This conclusion is in keeping with the Rules' intent to prevent trial by ambush and preference for trials on the merits. Therefore, we hold that the substance of Dr. Tynes's proposed testimony provided in the supplementary response by Dr. Elliott was sufficient to put the beneficiaries on notice as to how Dr. Tynes would testify. The beneficiaries knew who Dr. Tynes was and the substance of his proposed testimony over two years before trial. Their lack of sufficient preparation and reliance upon one word in the interrogatory response, in light of the substance of that response, weighs against them.

¶20. Both parties appear to agree that the fourth factor, the possibility of a continuance, does not fit the facts of the case because neither wanted a continuance. The beneficiaries argue that a continuance should not have been allowed because the exclusion of the testimony is the appropriate remedy according to *Huff v. Polk*, 408 So. 2d 1368 (Miss. 1982). Dr. Elliott submits that a continuance at trial is not the appropriate remedy because the beneficiaries had over two years to move for a continuance but did not, all the while having the substance of Dr. Tynes's testimony available to them in the interrogatory response.

¶21. In *Huff*, the trial court allowed the testimonies of expert witnesses, over the plaintiff's objection and motion to exclude their testimony, when the experts' names and the substance of their testimony were given to the plaintiff the morning of the beginning of trial. *Id.* at 1368-69. An interrogatory propounded over eight months before trial asked for this information, and the only response was that their identity was "Not determined at this time." *Id.* The trial court offered a continuance to the plaintiff, but this offer was rejected by the plaintiff. *Id.* This Court unanimously reversed the verdict for the defendant and stated the following concerning the offer of a continuance:

> [Defendant] contends that the noncompliance of the statute in question was cured when the lower court offered [plaintiff] a continuance. First, we have seen that [plaintiff] already had incurred the expense of

11

preparation for trial, including the payment to a medical expert who was on his way from Jackson to Meridian. We can almost take judicial knowledge that this would be rather expensive.

The main point, however, is that under the lower court's ruling in this case, in justifying his actions by offering a continuance, the court is setting up a situation where either party to a cause in litigation may decide that he will not be ready for trial on the day it is set and wishes a delay. He could get one by not conforming to the above quoted discovery rules until the morning of the trial, knowing that he would get a continuance by the court giving the already prepared opposition a continuance. We certainly cannot condone the possibility of a situation such as that being legalized.

*Id.* at 1371. The beneficiaries allege that calling Dr. Tynes as an expert in infectious disease was the equivalent of revealing his identity just before trial, and thus they attempt to analogize this factually distinguishable case with the case sub judice. We are not convinced that a continuance would have been inappropriate given the facts in the record. However, the learned trial judge is in a better position than this Court to determine the effect a revelation such as the one in the instant case has upon the course of a trial. Because the parties are in agreement on this issue and because the offer of an interview provided the beneficiaries with an opportunity to recover and adjust their strategy, we find that the trial court did not err by failing to offer a continuance. We also disagree with the beneficiaries that the facts in *Huff* are analogous to the facts in the instant case.

¶22.    As stated previously, the substance of the supplementary interrogatory response was sufficient to put the beneficiaries on notice of Dr. Tynes's expected testimony in spite of the misidentification of his field of expertise. The plaintiffs in *Huff*, however, did not know either the identities of the defendant's experts or their expected testimony before the day of trial. The trial court in the case at bar offered the beneficiaries the opportunity to interview Dr. Tynes before he testified. Since the beneficiaries rejected this offer, we conclude that this factor weighs in favor of neither party.

12

¶23. In summary, it was serious negligence for Dr. Elliott's response to an interrogatory concerning his experts to misidentify Dr. Tynes as a urologist when in fact he was not. Although the beneficiaries might have discovered this by requesting a copy of the missing curriculum vitae, it is not their duty to police the veracity of the responses they received. However, Dr. Tynes's testimony, as the beneficiaries readily admit, was necessary to counter the testimony of the beneficiaries' expert, and Dr. Elliott's case would have been drastically affected had his testimony been excluded. Furthermore, the substance of the interrogatory response concerning Dr. Tynes's expected testimony was sufficient to give the beneficiaries adequate notice of his expertise, despite his misidentification as a urologist. The fault for their overreliance upon a single word when preparing for trial and dismissing NMMC lies with them. Finally, the offer of an interview was an appropriate remedy considering the facts of this case, so a continuance need not have been offered nor accepted. This factor favors neither party. Considering the balance of these equities, we find that the trial court did not abuse its discretion when it allowed Dr. Tynes to testify.

## II. WHETHER THE TRIAL COURT ERRED IN ALLOWING DR. TYNES TO GIVE EXPERT OPINION TESTIMONY NOT DISCLOSED IN DISCOVERY.

¶24. The beneficiaries allege that Dr. Tynes's testimony went beyond the substance of the interrogatory response and that the trial court abused its discretion by allowing Dr. Tynes to testify concerning these areas allegedly outside the scope of his response. Dr. Elliott replies that an interrogatory response should not be as substantial as a deposition and that the substance that was provided in the response, coupled with the notion that all physicians have a working knowledge of anatomy, stated a sufficiently broad scope to accommodate Dr. Tynes's testimony.

¶25. Rule 26 requires a respondent to an expert interrogatory to "state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is

13

expected to testify and a summary of the grounds for each opinion." M.R.C.P. 26(b)(4)(A)(i). While compliance with this rule necessarily involves a fact-intensive comparison of the responses to the interrogatory with the testimony adduced at trial, this Court has established a few guidelines when determining what constitutes an acceptable response. "Vague or unresponsive answers to interrogatories cannot be tolerated if the process of discovery is to survive as a reasonable method of discovering the information requested in the interrogatories." *Square D Co. v. Edwards*, 419 So. 2d 1327, 1329 (Miss. 1982). The information provided in the response must be more than what is contained in a pleading. *Nichols v. Tubb*, 609 So. 2d 377, 385 n.5 (Miss. 1992). An expert should not be allowed to testify concerning a subject matter which is not included in the response to the interrogatory. *Cf. Coltharp v. Carnesale*, 733 So. 2d 780 (Miss. 1999) (expert testified concerning avascular necrosis theory of plaintiff's injury which was not revealed to plaintiff during discovery; trial court committed reversible error in allowing doctor's testimony); *T.K. Stanley, Inc. v. Cason*, 614 So. 2d 942, 950-51 (Miss. 1992) ("Permanent disability is a separate subject matter from causation"; trial court found in error when admitting expert testimony on causation in light of interrogatory response); *Winston v. Cannon*, 430 So. 2d 413, 415 (Miss. 1983) (where plaintiff's expert testified his original report indicating no permanent injury to plaintiff should be changed to reflect permanent injury; trial court was not in error when it did not permit expert to testify about permanent injury). However, where the stated subject matter in the response necessarily includes the subject matter testified to at trial, it is an abuse of discretion to exclude the expert's testimony. *See Lumpkin*, 725 So. 2d at 734. *See also Peterson v. Ladner*, 785 So. 2d 290, 295-96 (Miss. Ct. App. 2000); *Ford v. Johnson*, 750 So. 2d 546 (Miss. Ct. App. 1999).

¶26. The beneficiaries complain that the trial judge should have excluded Dr. Tynes's testimony in the following situations:

> (1) Dr. Tynes testified concerning the effort it would take to perforate the colon, namely that one would have to puncture the prostatic capsule, two layers of fascia, and three layers of colon and that doing so was highly unlikely for a urologist with thirty years' experience;

> (2) Dr. Tynes testified concerning the results of the cystogram;

> (3) Dr. Tynes testified what a surgeon should find during exploratory surgery in the "perineal" space if the colon was punctured during catheterization.

> (4) Dr. Tynes testified that the failure to find a perforation in the colon during the exploratory surgery indicated the probability that it was not punctured.

All four, they allege, were beyond the scope of the substance of the interrogatory response.

¶27. We find that the substance of the interrogatory response was sufficient to put the beneficiaries on notice that Dr. Tynes's testimony would include the four complained-of portions of his testimony. The effort required to puncture the colon through the urethral passage was a fact encompassed in Dr. Tynes's opinion that the colon was not punctured when the catheter was inserted into Buskirk's bladder. The same is true for the results of the cystogram, which would have revealed a puncture in the urethra. Ironically, Dr. Tynes's misidentification as a urologist should have put the beneficiaries on notice that Dr. Tynes's testimony would involve the results of the cystogram. This also holds true for the testimony concerning the lack of infection in the expected places and the evidence that no puncture could be seen in the colon during the exploratory surgery. Therefore, we conclude that Dr. Tynes's testimony did not go beyond the scope of the interrogatory response and this issue is without merit.

15

### III.  WHETHER THE TRIAL COURT ERRED IN DENYING THE PLAINTIFFS' MOTIONS FOR A DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

¶28.    The beneficiaries allege that reasonable jurors could not have arrived at a conclusion other than Dr. Elliott was negligent.  Therefore, they contend that the trial court erred in denying their motion for a directed verdict at the conclusion of evidence and their motion for judgment notwithstanding the verdict after the jury rendered its verdict for Dr. Elliott.  They recite a long and persuasive list of undisputed testimony which favors this conclusion.  Dr. Elliott responds that there are sufficient facts in the record to create a jury question as to his negligence such that reasonable jurors could disagree.

¶29.    This Court's well-known standards of review for the denial of a directed verdict or a JNOV are identical:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997) (quoting *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 252 (Miss. 1993)).

¶30.    It was uncontested at trial that the bacteria causing the infection which killed J.C. Buskirk originated in his colon or rectum.  The two nurses, the surgical resident, and Dr. Elliott testified that procedures were followed during the catheterization which should have kept the area around and inside Buskirk's urethra sterile.  The beneficiaries' expert testified that he was of the opinion that Buskirk's colon was perforated

16

during catheterization, infecting the retroperitoneal space with the colon bacteria. Dr. Elliott admitted that the only thing capable of perforating the colon used during the catheterization was the stiff guide.

¶31.    However, no physical evidence was introduced to indicate Buskirk's colon was actually perforated. During the exploratory surgery, no puncture was found in Buskirk's colon. In the examination of the perineal space, no bacteria were found there although they should have been present had the colon been perforated during catheterization. Likewise, no infection was found in the urethra, and a urinalysis of Buskirk's urine conducted after the first catheterization returned negative results for rectal bacteria. Furthermore, the cystogram revealed no leakage in the urethra which would indicate the opportunity for infection in the perineal or the retroperitoneal space. Finally, no puncture of the colon was found during the colostomy. These facts differ sufficiently that a jury question was created where reasonable minds could differ as to whether Dr. Elliott was negligent. Thus, the trial court did not err in denying a directed verdict and a judgment notwithstanding the verdict.

## IV.    WHETHER THE TRIAL COURT ERRED IN DENYING THE PLAINTIFFS' MOTION FOR A NEW TRIAL.

¶32.    The beneficiaries finally argue that the trial court erred by denying their motion for a new trial. They state this Court should discount Dr. Tynes's improper testimony when examining this issue. We have found the testimony of Dr. Tynes to be proper considering the wording of the interrogatory response and the testimony adduced at trial. Therefore, the task of proving the trial court committed error in denying this motion is difficult considering the evidence examined in the issue above. Dr. Elliott responds that Dr. Tynes's testimony was proper and the trial court did not abuse its discretion in denying the motion.

¶33.    This Court will reverse a trial court's denial of a motion for a new trial only when it amounts to an abuse of the court's discretion. *Steele*, 697 So. 2d at 376 (collecting authorities). A new trial will not be

17

ordered unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. *Whitten v. Cox*, 799 So. 2d 1, 13 (Miss. 2000) (collecting authorities).

¶34.     Dr. Tynes's testimony was properly allowed at trial as discussed in Issues I and II. Since no additional facts are alleged to weigh overwhelmingly in the beneficiaries' favor than the facts examined in Issue III, we find that this issue is without merit considering the previous discussion of these issues.

## CONCLUSION

¶35.     The interrogatory response which misidentified Dr. Tynes as a urologist, but fully informed the beneficiaries of the subject matter and substance of his opinions and the facts upon which they were based, was not a discovery violation. The trial court did not err in allowing Dr. Tynes's to testify and to the extent that he testified. The trial court did not err in denying the motions for directed verdict and for judgment notwithstanding the verdict or a new trial. Therefore, the trial court's judgment is affirmed.

¶36.     **AFFIRMED.**

**SMITH, P.J., WALLER, COBB AND CARLSON, JJ., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., AND DIAZ, J., NOT PARTICIPATING.**