918 So.2d 697 (2004)
Thomas R. McFARLAND, Appellant
v.
ENTERGY MISSISSIPPI, INC., Appellee.
No. 2003-CA-00538-COA.
Court of Appeals of Mississippi.
October 12, 2004.
Rehearing Denied January 11, 2005.
*698 Robert W. Sneed, Jackson, attorney for appellant.
John H. Dunbar, Walter Alan Davis, Oxford, attorneys for appellee.
EN BANC.
BARNES, J., for the Court.
¶ 1. Thomas R. McFarland brought suit against Entergy Mississippi, Inc. for injuries he received when the truck he was driving collided with a power line maintained by Entergy. The trial judge overruled Entergy's motion for a directed verdict after the evidence was presented and allowed the case to be heard by the jury. The jury returned a verdict for McFarland in the amount of $300,000. The judge then granted Entergy's motion for a judgment notwithstanding the verdict (JNOV) and stated that a new trial would be warranted if the grant of the JNOV was overturned on appeal.
¶ 2. McFarland has appealed the decision of the trial judge. He argues that the trial court failed to consider the evidence in the light most favorable to him and failed to give him the benefit of the favorable inferences from the evidence. He asserts that there was more than sufficient evidence to support the jury's verdict and damages and asks this Court to reinstate them. He also raises that Entergy had a clear duty to warn him of the dangerous condition of the transmission line and that there is no exception to Entergy's heightened standard of care. He contends that Entergy's argument that the Manual on Uniform Traffic Control Devices (MUTCD) prevented the company from warning motorists of the dangerous condition of the transmission line is "disingenuous at best" and misleading.
¶ 3. Because we find that, based on the evidence presented, the jury could, and did, reasonably and logically find that Entergy did not exercise the degree of care and skill reasonably expected of the utility company, we reverse the trial court's grant of judgment not withstanding the verdict and remand for a new trial consistent with the trial court's order.

FACTS
¶ 4. On February 9, 1994, due to an ice storm in the Mississippi Delta, most intersections in Washington County, Mississippi, were closed due to fallen tree limbs and power lines. The storm was one of the worst on record, and the damage was extensive, affecting thousands of residents and requiring Entergy to bring in 2,500 extra workers from surrounding states. By as late as the eleventh, all major intersections had been cleared. On North Main Street, just north of the city of Leland, one of Entergy's transmission lines hung only six to eight feet above the road surface. This transmission line ran from Greenville to Indianola and was properly secured in other intersections except the one in question which did not contain any warning devises for motorists.
¶ 5. Transmission lines are "very high voltage," carrying between 115,000 and 500,000 volts of electricity, and are roughly the size of a person's wrist. They run cross-country to substations where the voltage is passed through power transformers in order to be "stepped down" to *699 13,000 volts for distribution into towns via smaller distribution lines which are approximately the size a person's thumb. Although the testimony was unclear as to the exact voltage and diameter of the line with which McFarland came into contact, Entergy employees admitted the transmission line was "very strong."
¶ 6. Deputy Sheriff Tony Sullivan testified that he noticed the low-hanging line, which he described as a "cable," in the days preceding the accident but that barricades were in front of the line to protect traffic. According to Sullivan, he returned to the scene on February 14 and saw that while the power line was still down, the barricades had been removed. Sullivan testified that he drove to the Mississippi Power and Light[1] substation less that 100 yards from the low-hanging line and found crews present. He approached an MP & L truck and spoke to the MP & L employee, who was in the driver's seat. Deputy Sullivan testified he informed the MP & L employee "that this was a hazardous situation, that the barricades needed to be put back up or either the lines needed to be taken down because at some time drivers come in going to La-Z-Boy and that some time they come across down North Main, and its another little street they can go across and it brings them out at La-Z-Boy. I told him that it was a hazardous situation." Although he could not recount the employee's exact response at trial nine years later, Deputy Sullivan testified that he left "under the impression that [the employee] was going to take care of the problem or either put the barricades back up."
¶ 7. Approximately three to four hours later, McFarland's eighteen wheeler struck the transmission line. McFarland lost consciousness and spent ten days in the LeFlore County hospital before going home to Los Angeles for further treatment. His total medical expenses were approximately $18,500 coupled with pain and suffering; his lost wages were approximated at $90,000.

DISCUSSION
¶ 8. A motion for JNOV challenges the sufficiency of the evidence to support the jury's verdict. Patton-Tully Transp. Co. v. Douglas, 761 So.2d 835, 843 (Miss.2000). A jury verdict can only be set aside when it is based on legally insufficient evidence or it is against the substantial weight of the evidence. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1098-99 (Miss. 1992). When considering the grant or denial of a JNOV, the court must consider the evidence in the light most favorable to the non-movant, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. Buskirk v. Elliott, 856 So.2d 255, 266(¶ 30) (Miss.2003); Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997). Furthermore, we review "the evidence as a whole, taken in the light most favorable to the verdict" and will affirm the grant of JNOV only if "no reasonable, hypothetical juror could have found as the jury found." See Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss.1985).
¶ 9. In this case there was evidence which could have supported a jury verdict for either party. It is not for this Court to reweigh the evidence, but to consider the evidence in the light most favorable to the verdict which resulted and which favors McFarlane. "A verdict returned by a jury in a civil case is afforded substantial deference when the dissatisfied litigant seeks to have the court enter a judgment compelling a contrary outcome." Hearn v. *700 Brown, 876 So.2d 380, 382(¶ 10) (Miss.Ct. App.2003).
¶ 10. Entergy's motion for a JNOV presented three grounds: (1) the evidence was insufficient to prove liability; (2) Entergy had no right or duty to place traffic control devices on North Main Street under the circumstances of this case; and (3) Entergy would have violated the Manual on Uniform Traffic Control Devices (MUTCD) by placing cones on the street when Entergy was not working there. As we will discuss, there was sufficient evidence favorable to McFarland to support the jury's findings. We are also not convinced that Entergy may use the MUTCD to shield itself from responsibility in this case. In granting the JNOV "based on the grounds asserted," the trial judge was clearly in error.
¶ 11. The public policy of this State requires "utilities to exercise a very high degree of care in protecting the public from the dangers of electricity." Entergy Mississippi, Inc. v. Burdette Gin Co., 726 So.2d 1202, 1208(¶ 17) (Miss.1998); see also Entergy Mississippi, Inc. v. Hayes, 874 So.2d 952, 956(¶ 22) (Miss.2004) (quoting Burdette).
[S]ince 1907 th[e Mississippi Supreme] Court has bound corporations handling the dangerous agency of electricity to the very highest measure of skill and care in dealing with this deadly agency. [Mississippi Power & Light Co. v. Shepard, 285 So.2d 725, 730 (Miss.1973) ] also reaffirmed the rule that a public utility company must place its wires so they are not dangerous to persons and property. It is the continuing duty of the utility to maintain its wires over streets and highways in such a manner that they will not become dangerous to persons and property. The Court also recognized that the duty is not absolute. The utility is not an insurer against all injuries in any event, however, the rule is not satisfied so as to relieve the utility from liability unless and until it is shown that the company has exercised the highest degree of care to prevent the danger.

Mississippi Power Co. v. Luter, 336 So.2d 753, 756 (Miss.1976) (emphasis added).
¶ 12. The evidence is undisputed that the line with which McFarland came into contact was a very strong transmission line hanging only six to eight feet above North Main Street just outside the Leland city limits. The impact knocked McFarland's eleven-ton truck backwards, tore the driver's seat from its socket, and threw McFarland into the sleeping compartment of the vehicle where he was in severe pain and coughing up blood. McFarland broke five ribs, had his chest caved in on the right side and his teeth shaved off in the front. He was hospitalized for ten days, had surgery to repair broken bones in his wrist and required seven months of physical therapy.
¶ 13. Whether the Entergy line was unreasonably dangerous at the time and place of the accident is not a question for the trial court, or this Court, to decide. In Mississippi Power & Light Co. v. Shepard, 285 So.2d 725 (Miss.1973), the Mississippi Supreme Court recognized the general rule regarding the submission of a power company's negligence to the jury to be:
The question of negligence is one for the jury to decide from the facts of each particular case, except where reasonable men may not fairly differ in their conclusions from the facts, and in determining the question of the degree of care to be exercised, it is proper for the jury to take into consideration the location of the lines, whether in thickly or sparsely settled communities, the use to which they are to be put, their remoteness or *701 proximity to travelers on the highway, the harmless or dangerous character of the current to be transmitted, and any other circumstances affecting the case. No liability to respond in damages will attach in the absence of negligence on the part of the company or its employees proximately causing the injury complained of.
Shepard, 285 So.2d at 737-38 (quoting W.J. Dunn, Annotation, Liability for Injury or Death Resulting When Pipe or Other Object Is Manually Brought Into Contact with Electric Line, 69 A.L.R.2d 9, 15-16 (1960)) (emphasis added). The court continued that where there is a conflict of evidence or inferences as to "the dangerous character of particular wires, or as to what constitutes such ordinary travel on a highway as should be reasonably anticipated by a company maintaining wires thereon, the question is one of fact for the jury." Shepard, 285 So.2d at 738 (quoting 26 Am. Jur.2d Electricity, Gas and Steam § 191, at 403 (1966)). In the instant case, there was sufficient evidence from which a reasonable jury might find that the transmission line at issue was unreasonably dangerous.
¶ 14. There is no dispute that the ice storm which struck the Mississippi Delta on February 9, 1994, was severe, downing thousands of power lines. An electric company's duty to safeguard the public against injury in the use of its dangerous agency exists, however, "whether the danger arises from its negligence, the negligence of others, or from causes over which it has no control to the extent of exercising reasonable care to correct or remove the cause of danger if reasonably forseeable and known to the power company." Shepard, 285 So.2d at 729. An Act of God, such as an unprecedented storm, will excuse liability, provided the storm is the "sole cause of the injury"; however, "if the injury is caused by an Act of God, in connection with which the negligence of the defendant is a concurring cause, and the injury would not have occurred except for such negligence," the defendant is liable. Public Service Co. v. Sonagerra, 208 Okla. 95, 98, 253 P.2d 169, 171 (1953).
¶ 15. Entergy employees admitted that by Sunday, February 13, the weather had warmed, and there was some thawing. By Monday, February 14, much of the ice had melted. Thomas McFarland left Los Angeles on February 11 and first learned of the ice storm when he reached Oklahoma City. He delivered goods to Little Rock on February 13 and spent the night there. On the morning of February 14, he received orders to pick up a load at 8:00 that night at the La-Z-Boy facility in Leland, Mississippi. He was informed that there had been an ice storm and to be careful heading south because some poles were breaking; a veteran truck driver with twenty one years' experience, McFarland knew to be "very careful" on wet or icy roads. He had never been to Leland, but the road conditions from Little Rock to Memphis were "perfect," and McFarland encountered no ice. On Interstate 55 from Memphis, the road conditions were "good," "dry," and traffic was "moderate." On Highway 82, traffic was "mild," and as McFarland drove into Washington County, he saw nothing that would make him stop or choose a different route. McFarland testified that the roads were in "very good shape to me, as far as them having an ice storm." Lights were on in businesses, including the La-Z-Boy facility to which McFarland was heading.
¶ 16. At 7:23 p.m., McFarland collided with a very strong Entergy transmission line which was hanging six to eight feet above the North Main Street just outside the Leland city limits. There were no warning devices or barricades to disclose *702 or warn McFarland of the low-hanging line; had there been, McFarland testified that he would have "stopped immediately."
¶ 17. At trial, there was a disputed issue as to whether the location of McFarland's accident was on a "main thoroughfare." Former Deputy Sheriff Tony Sullivan who worked the accident testified that North Main Street was a main thoroughfare for the Elizabeth/Leland area; Entergy employees, on the other hand, testified that the road was "relatively obscured." There was no question, however, that McFarland had a legal right to be on the street. There was no evidence that any curfew was in effect which would have prohibited his driving at that time or location. Under Mississippi law, a utility company's duty of exercising care "extends to every place where persons have a right to be, whether for business, convenience, or pleasure, and extends to those on the premises of consumers, and it makes no difference that the injury occurred on private property and not in a public highway if the person ... injured had a right to be" there. Mississippi Power & Light Co. v. Walters, 248 Miss. 206, 242, 158 So.2d 2, 15 (1963) (quoting 29 C.J.S. Electricity § 42).
¶ 18. While Entergy may not have had sufficient time to repair every downed line, the issue is not whether every downed line could be repaired but whether Entergy knew or should have known of the downed line in question and whether Entergy had a duty of care to protect the public from this potentially dangerous situation under all the circumstances presented at trial. The Mississippi Supreme Court has recognized that "the duty required of the company in respect to the maintenance of its electric wires is an active duty  not merely a passive obligation to act only when some third person has gone to the trouble to volunteer information to the company of a particular danger at a particular place." Mississippi Power Co. v. Thomas, 162 Miss. 734, 739, 140 So. 227, 228 (1932). The Thomas court held that company's obligation to inspect is resolved by application of the above rule of care "to all the facts and circumstances of the case, and ordinarily it will be a matter for the jury." Id.
¶ 19. Entergy challenges Deputy Sullivan's testimony as insufficient to provide the company with notice of the dangerous condition in that McFarland offered no testimony as to the course and scope of employment of the employee with whom Deputy Sullivan spoke. However, the circumstantial evidence, including the employee's presence at the Entergy substation and his conversation with Deputy Sullivan which left Sullivan with the impression that the employee was to address the situation, is sufficient to establish a question of fact for the jury's consideration in this case. See Delta Electric Power Assoc. v. Burton, 240 Miss. 209, 217-19, 126 So.2d 258, 260-61, suggestion of error overruled, 240 Miss. 209, 223, 126 So.2d 866, 866 (1961) (where record reflected that electric company's service men had seen dangerous condition, evidence was sufficient to show notice on the part of the company; "whether notice to a meter reader alone would be sufficient would depend upon particular facts and circumstances of each case"); Russell v. New York State Elec. & Gas Corp., 276 A.D. 44, 93 N.Y.S.2d 3, 8 (N.Y.App.Div. 1949) (where police officer testified that he spoke with power company employee via telephone and had been told downed power line was being taken care of, "jury had a right to believe under such circumstances that the company had notice without proof of the identity of the listener"), aff'd, 301 N.Y. 593, 93 N.E.2d 493 (1950); see also Cameron v. Hootsell, 229 Miss. 80, 83-87, 90 So.2d 195, 197-98 (1956) *703 ("where general relationship of master and servant is shown, a rebuttable presumption is raised that the servant at the time of accident was engaged in the scope of his employment"; where injured party identified company vehicle by description, circumstantial evidence presented jury question as to whether the truck belonged to appellee and was being negligently operated on the occasion by the servant or agent of the appellee acting within the scope of his employment; "[t]he evidence is circumstantial, and we have held that where a case turns upon circumstantial evidence it should rarely be taken from the jury").
¶ 20. While Entergy representatives denied that any conversation took place between Deputy Sullivan and any of its employees, and, in fact, denied that Entergy employees were even in the area that day, resolution of these issues of fact was for the jury to decide. Dusty Holman, Entergy's transmission line maintenance supervisor, admitted that, prior to February 14, he sent no personnel out to inspect the downed transmission line from Greenville to Leland where it passed road surfaces to determine whether dangerous conditions existed for motorists. He, therefore, disavowed any knowledge of the dangerous condition of the line at issue. He submitted, however, that had he learned of the problem as of 3:30 p.m. on February 14 (in accordance with Deputy Sullivan's testimony), he could not have gotten the crew and equipment needed to cut the line "and complete the job" prior to McFarland's accident at approximately 7:30 p.m. This inability would have been due, Holman testified, to the specialized equipment and techniques necessary for work on transmission lines, as opposed to distribution lines, due to the size, strength and tension of transmission lines. Whether and when Entergy knew or should have known of the particular low-hanging line and whether Entergy had time to correct the dangerous situation prior to 7:23 p.m. on February 14, five days after the onset of the ice storm, were properly submitted for the jury's consideration.
¶ 21. In Public Service v. Sonagerra, 208 Okla. 95, 253 P.2d 169 (1953), the Oklahoma Supreme Court addressed the issue of negligence when a severe ice storm caused power lines to sag, leading to an injury to a property owner:
Defendant was required to use that care, skill, and diligence that would ordinarily be used by a careful and prudent person in the transmission and distribution of electric energy in the construction and maintenance of its lines, poles and other equipment. Whether or not defendant exercised such care, skill and diligence in the repair and restoration of its service lines to the Cuzalina house which this unprecedented storm caused to sag as they crossed plaintiff's property, is a question of fact for the jury. This question is so well settled that citations of authority are not necessary.
The verdict of the jury in this case places a heavy burden on an electric service company in face of such a severe storm. However, regardless of how we may feel with regard to the diligence of the defendant in restoring its lines and service in the light of the situation with which it was confronted, we cannot say as a matter of law that the defendant used that care, skill and diligence that would ordinarily be used by a careful and prudent person in the manner in which it restored its electric service lines across plaintiff's property and which caused her injury.
Sonagerra, 208 Okla. at 99-100, 253 P.2d at 173.
¶ 22. The Manual on Uniform Traffic Control Devices (MUTCD) was published *704 by the U.S. Department of Transportation to give a uniform guideline for traffic control devices. Entergy apparently raised the applicability of the MUTCD for the first time on the eve of trial, claiming that Entergy lacked the authority to place warning signs in the road, and that to do so would cause them to become subject to liability under MUTCD § 1A-3.1, which states that "[a]ny unauthorized sign placed on the highway right-of-way by a private organization or individual constitutes a public nuisance." Entergy admits that the MUTCD is "not a law" and does not preempt any common law or statutory obligation of the company; rather, Entergy contends the MUTCD to be "a national standard for applying legal duties." Under these circumstances, the MUTCD is a "red herring." From the evidence presented at trial, there were at least two ways in which Entergy might reasonably have assured that the traveling public, including McFarland, would be protected from the low-hanging line, without Entergy's violating any provision of the MUTCD. First, Robert Gramling, Entergy's division manager of the north central division during the 1994 ice storm, testified: "on occasions we have to call a city, county, or even highway patrol on a site if we are going to string new wire, or pull wire back up where traffic has to be stopped, literally shut down. We really don't have a legal right to do that. So we ask those legalappropriate law enforcement types to come and they make those closures." Gramling also testified that if Entergy personnel were in the area of a low-hanging transmission line, "he probably would not leave the site until the appropriate law enforcement agency got there with the appropriate MDOT barricades across the highway." Here, the jury reasonably found that Entergy should have made the call to law enforcement to assure that the closure was made and not have left the scene until the appropriate barricades were across the highway. The fact that Deputy Sullivan may have had the authority to put up a barricade or warning device, does not relieve Entergy of its duty to exercise "the highest degree of care to prevent the danger" when Sullivan departed without erecting any barricade or warning. Second, section 1A-3.1 of the MUTCD permits public utility companies to erect construction and maintenance signs at work sites "to protect the public, equipment, and workers." Gramling testified that when Entergy is working at a site, the workers put out warning signs and cones. Here, the jury could have reasonably found that the location of the low-hanging line should have been a work site by the time McFarland arrived. As previously discussed, Holman testified that he could not have gotten the crew and equipment needed to cut the line "and complete the job" prior to McFarland's accident at 7:30 p.m.; he did not testify that his crew could not have been on site working on the line. Entergy would then have been permitted to put up its warning signs and cones to alert traffic that a hazardous condition existed in the area, without violating the MUTCD.
¶ 23. The Mississippi Supreme Court has long held that a utility is not relieved of its liability until it has exercised the "highest degree of care." Luter, 336 So.2d at 756. In the instant case, the jury reasonably found that Entergy exercised insufficient care to protect the traveling public, including McFarland, from the low-hanging line. We find that the trial judge erred in granting the JNOV.
¶ 24. In Hearn v. Brown, 876 So.2d 380 (Miss.Ct.App.2003), this Court found that remand was proper where the trial court had both granted a JNOV and provisionally granted a new trial. The Court found that it lacked jurisdiction to review the *705 conditional order for new trial. Id. at (¶¶ 14-20). Our remand for a new trial is in keeping with this prior decision of the Court. We, therefore, remand this case for a new trial pursuant to the trial court order and consistent with this opinion.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE, P.J., IRVING, MYERS AND CHANDLER, JJ., CONCUR. BRIDGES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. ISHEE, J., NOT PARTICIPATING.
BRIDGES, P.J., dissenting:
¶ 26. I empathize with the majority's logic and reasoning, but I must respectfully dissent from the majority's conclusion to reverse the trial judge's decision to grant Entergy's motion for JNOV.
¶ 27. The trial judge instructed the jury that, in order to find Entergy liable for McFarland's injuries, they must conclude, by a preponderance of the evidence that (1) the transmission lines were in an unreasonably dangerous condition at the time and place the accident occurred, (2) Entergy knew or should have known the transmission lines were in an unreasonably dangerous condition, (3) Entergy failed to use ordinary and reasonable care in remedying or warning McFarland of the unreasonably dangerous condition of the transmission lines, and (4) the unreasonable and dangerous condition of the transmission line combined with Entergy's failure to remedy or warn McFarland of the unreasonably dangerous condition proximately caused the accident and McFarland's injuries.
¶ 28. After the jury returned a verdict for McFarland, the trial judge granted Entergy's motion for JNOV based on Entergy's assertions that (1) the evidence was insufficient to prove liability, (2) Entergy had no right or duty to place traffic control devices under the circumstances, and (3) Entergy would have violated the MUTCD and risked liability where it had none if they set out cones in an area that Entergy was not working.
¶ 29. In reviewing that decision, we cast all inferences in the non-moving party's favor. Buskirk v. Elliott, 856 So.2d 255, 266(¶ 30) (Miss.2003). A motion for JNOV is proper where no reasonable, hypothetical juror could have concluded as the jury did. Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss.1985). A trial court should set aside a verdict if the verdict would constitute an un unconscionable injustice. Groseclose v. State, 440 So.2d 297, 300 (Miss.1983).
¶ 30. The majority concludes that the jury had sufficient evidence to conclude that the transmission line was in an unreasonably dangerous state. The evidence demonstrated that Entergy's transmission line hung seven or eight feet from the ground. A severe ice storm crippled the area and left tens of thousands without power. Entergy called in over two thousand workers from other states to expedite the necessary repairs. Approximately 45,000 people were affected by power outages. At the time of the accident, Entergy could not have repaired or restored every downed line. However, the ice storm pulled trees and power lines down in vast quantities. Simply enduring the situation was dangerous for most people. Traveling was dangerous. Lack of electricity was dangerous to those who could not heat their homes.
¶ 31. The majority cites the proposition that "where there is a conflict of evidence *706 or inferences as to ... the dangerous character of particular wires, or as to what constitutes such ordinary travel on a highway as should be reasonably anticipated by a company maintaining wires thereon, the question is one of fact for the jury." Mississippi Power & Light Co. v. Shepard, 285 So.2d 725, 738 (Miss.1973). Here, there is no evidence that "ordinary" amounts of traffic were present at that time and in that area. Rather, testimony indicated that a barricade prevented access to the area prior to the accident. Who or what removed that barricade remains a mystery.
¶ 32. The majority cites the proposition that "a public utility company must place wires so they are not dangerous to people or property." Mississippi Power Co. v. Luter, 336 So.2d 753, 756 (Miss.1976). There is no evidence that suggests that Entergy's placement of lines caused McFarland's injuries. Rather, the lines were displaced due to the ice storm.
¶ 33. The majority also cites the proposition that Entergy has a "duty to maintain wires over streets and highways in such a manner that they will not become dangerous to persons or property." Id. There is no evidence that improper maintenance of the transmission line caused McFarland's injury.
¶ 34. The majority admits that a utility company's duty is not absolute and that a "utility is not an insurer against all injuries." Id. I completely agree  but holding Entergy liable here requires, in my opinion, that Entergy be held to an absolute duty.
¶ 35. The majority says that the "rule is not satisfied so as to relieve the utility from liability unless the utility company has exercised the highest degree of care to prevent the danger." Id. Without question, Entergy could not prevent the ice storm. Nevertheless, did any evidence suggest that Entergy did not exercise the highest degree of care that they could, given the circumstances? Entergy simply did not have an opportunity to remedy the low line.
¶ 36. The majority states that "[i]f the injury is caused by an Act of God, in connection with which the negligence of the defendant is a concurring cause, and the injury would not have occurred except for such negligence, the defendant is liable." Public Service Co. v. Sonagerra, 208 Okla. 95, 98, 253 P.2d 169, 171 (1953). I agree that this Oklahoma case contains a correct statement of the law. However, I cannot conclude that Entergy's failure to respond to Deputy Sullivan's warning in a three-hour time window, in and of itself, qualifies as a concurring cause under the circumstances that existed at the time.
¶ 37. Additionally, the concurring cause must be one of a defendant's negligence. To find negligence, one must find that a duty existed and that a defendant breached that duty. That being said, should Entergy be liable for removing the barricade that prevented access to the transmission line? Did Deputy Sullivan or local authorities have any duty to prevent access to the transmission line for at least the amount of time it would take for Entergy to pull line workers from the projects that they were working on at that time? Those projects included restoring power to thousands who had been without electricity.
¶ 38. The majority describes Entergy's duty as one to safeguard the public against injury in the use of its dangerous agency from causes over which it has no control to the extent of exercising reasonable care to correct or remove the cause of danger if reasonably foreseeable and known to the power company. See Shepard, 285 So.2d at 729.
*707 ¶ 39. I agree with that standard. But, one must notice the conjunctive "and" that connects the two conditions that qualify that duty: the cause must not only be known but also reasonably foreseeable. I would hold that the 1994 ice storm was not reasonably foreseeable. Likewise, removing the barricade and exposing the public was not reasonably foreseeable. Nor was it reasonably foreseeable that a deputy sheriff would simply report an unquestionably dangerous situation  then abandon that situation based on simple notification. In a perfect world, Entergy could have instantaneously remedied every potentially deadly threat  but people who endured that unprecedented disaster know such was impossible.
¶ 40. The majority states that the issue is not whether every downed line could have been repaired. Rather, the majority concludes that the issues are whether Entergy knew or should have known of the downed line in question and whether Entergy had a duty of care to protect the public from this potentially dangerous situation under all the circumstances presented at trial.
¶ 41. I agree with the majority's foundation of the issues. I agree that we must consider whether Entergy had a duty of care. However, I feel that the more important consideration is whether Entergy breached that duty of care.
¶ 42. As the majority states, "the duty required regarding maintenance of its electric wires is an active duty  not merely a passive obligation to act only when some third person has gone to the trouble to volunteer information to the company of a particular danger at a particular place." Mississippi Power Co. v. Thomas, 162 Miss. 734, 739, 140 So. 227, 228 (1932). That duty pertains to maintenance of wires. I feel that repairing line damage on an unusually massive scale requires efforts greater in scale than maintenance.
¶ 43. The majority states that Deputy Sullivan told some Entergy employees that a line was down and needed to be repaired or put barricades up. If Deputy Sullivan recognized the danger, why did he not do more to insulate the public? Why did he not divert traffic during the interim?
¶ 44. Instead, he reported to some employee in a service truck. Although Entergy disavowed receiving that notification, we must assume the facts in the light most favorable to the non-moving party. Buskirk, 856 So.2d at (¶ 30). Thus, we assume that Deputy Sullivan reported the missing barricade and downed line to an Entergy employee. Even under that scenario, it would take time for the employee to report the deputy's notification to someone who could route the proper crews and equipment to the scene. Holman testified that he could not have gotten a proper crew to the site in sufficient time to prevent McFarland's injury. It is not outside the realm of probability to take that testimony and conclude that any available crews would have been working on another problem at another location and would have had to either finish that project or take sufficient steps to dispose of any dangerous instrumentalities before leaving one project to report to the one the deputy warned of. If a crew did not adequately secure a prior project, they risked exposing themselves and Entergy to liability.
¶ 45. The result is that some time must pass between notification and possible response. Apparently, greater than three to four hours  the amount of time that passed between notification and McFarland's injury. It seems that, under the totality of the circumstances, the simple act of notification is insufficient to create liability where there would be none otherwise.
*708 ¶ 46. The majority states that "whether notice ... would be sufficient would depend upon particular facts and circumstances of each case." Russell v. New York State Elec. & Gas Corp., 276 A.D. 44, 93 N.Y.S.2d 3, 8 (1949). Accordingly, the facts and circumstances show that notice was insufficient when weighed against the conflicting responsibilities and Deputy Sullivan's potential to inform someone other than an unidentified employee.
¶ 47. In Russell, the police officer spoke with a power company employee via telephone and was told the downed line was being taken care of. There is no such testimony in this case. Russell is analogous, but not directly on point. There was no telephone conversation with a central office or body whose purpose is to field incoming calls. There was no statement from Entergy that they would immediately remedy the situation. Deputy Sullivan merely had an impression, and not even an impression of immediate repair  just that someone would address the situation. Naturally, Entergy would address a low-hanging transmission line, but no testimony suggested that Entergy would, or even could, drop everything to respond immediately. No testimony suggests that the anonymous employee guaranteed an immediate response. Deputy Sullivan's impression falls short by degrees compared to a guarantee. Combined with Entergy's testimony that denied such a conversation and denied that employees were in the area, I would hold that no issue of fact required jury resolution at this point and no reasonable hypothetical juror could have evidence to convey liability at this point. Holman testified that had he learned of the problem at 3:30 p.m., as Deputy Sullivan suggests, he could not have prevented the accident by repairing the problem.
¶ 48. Even if Entergy received notification of the downed line, I am unaware of any precedent that requires Entergy to drop all other matters in preference of one duty where fulfillment of that duty could, and most likely would have, created a breach of other duties in countless other places. Regardless that the incident occurred five days after the commencement of the ice storm, Entergy was responsible for massive levels of cleanup and restoration of service.
¶ 49. In Public Service v. Sonagerra, 208 Okla. at 99-100, 253 P.2d at 173, the Oklahoma Supreme Court determined that "utility companies are required to use that care, skill, and diligence of a careful and prudent person in the transmission and distribution of electric energy in the construction and maintenance of its lines, poles and other equipment." "Whether or not a utility company exercised such care, skill, and diligence in the repair and restoration of its service lines ... which this unprecedented storm caused to sag ... is a question of fact for the jury." Id. The majority concludes that the jury heard sufficient evidence to conclude that Entergy did not use that care, skill, and diligence that a careful and prudent person would use.
¶ 50. Here, there is simply no evidence that Entergy did not use reasonable care, skill, and diligence in relieving the downed transmission line. Restoring a transmission line requires a greater degree of care, skill, and diligence than it would take to repair a service line. Restoring a transmission line requires special training and equipment. No evidence suggests that Entergy was negligent in the amount of care they used to repair the line. No evidence suggests that Entergy lacked the skill to repair the line. If anything, the only viable allegation is that Entergy was less than diligent in responding and repairing the downed line.
¶ 51. The majority also suggests that the jury found Entergy should have called law enforcement to assure closure of the *709 area. The evidence shows that it was law enforcement who notified Entergy. Why should Entergy bear the duty to ensure law enforcement is aware of and prevents injury when law enforcement not only was aware of the danger, but actually reported it?
¶ 52. The majority quotes section 1A-3.1 of the MUTCD for the proposition that utility companies can put up signs at work sites. At the time of the injury, the location was not a work site. Entergy was not in the process of repair or maintenance.
¶ 53. The majority's contention that the jury could have found that the location of the low hanging line could have been a work site and thus Entergy could have put out signs mischaracterizes Holman's testimony. Holman testified that Entergy could not have gotten a crew and equipment to the site on time to prevent the accident. Holman also testified that one needs specialized equipment to repair a transmission line. The majority would have inadequate crews doing essentially no more than appearing to perform some work for the purpose of putting up signs. This pulls otherwise useful crews away from tasks so that the crews can police a downed line. It seems improper to insinuate what the jury may have thought regarding the realm of possibilitiesespecially when no evidence suggests a lack of diligence in rerouting the proper crews and equipment to the downed line.
¶ 54. The majority states that Entergy is liable unless it exercises the highest degree of care. Luter, 336 So.2d at 756. Based on that statement, the majority determines that the jury could have found that Entergy exercised no care for the traveling public. A "plaintiff must demonstrate duty and breach of duty before any other element. Duty and breach `are essential' to a finding of negligence." Brown ex rel. Ford v. J.J. Ferguson Sand & Gravel Co., 858 So.2d 129(¶ 8) (Miss.2003) (citing Strantz v. Pinion, 652 So.2d 738, 742 (Miss.1995)). To single out that Entergy exercised no care for the traveling public ignores the overwhelming weight of evidence that shows that Entergy exhibited care and diligence in responding to the ice storm and restoring power to a significant portion of the population of this state.
¶ 55. A more proper allegation would be that Entergy did not exercise the proper amount of care and diligence in responding to law enforcement's notification of a dangerous situation among dangerous situations. No evidence indicates that Entergy removed the barricade or that Entergy was less than diligent in responding with proper logistic efficiency to remedy the situation. No evidence suggests that local law enforcement was unaware of the danger  even in the light most favorable to McFarland, the evidence shows law enforcement knew of the danger before Entergy did.
¶ 56. Although the majority espouses sound legal principles and thorough analysis, the effect of this Court's holding, I fear, may create an almost unlimited duty in even the most harsh situations. The effect places an unreasonably high duty upon Entergyrising to the level of unconscionable injustice. Effectively, utility companies need only know about a danger to be liable  response becomes irrelevant, diligence becomes irrelevant, ability becomes irrelevant. Apparently, nothing aside from policing a danger can absolve a utility company of that duty  not even reliance on police, even where police report the danger. Accordingly, I most respectfully dissent.
GRIFFIS, J., JOIN THIS SEPARATE OPINION.
NOTES
[1] Mississippi Power and Light ("MP & L") is the predecessor of Entergy.